**PROVIDENCE HEALTH CENTER a/k/a Daughters of Charity Health Services of Waco and DePaul Center a/k/a Daughters of Charity Health Services of Waco, Petitioners,**

v.

**Jimmy and Carolyn DOWELL, Individually and on Behalf of the Estate of Jonathan Lance Dowell, Deceased, Respondents.**

**James C. Pettit, D.O., Petitioner,**

v.

**Jimmy and Carolyn Dowell, Individually and on Behalf of the Estate of Jonathan Lance Dowell, Deceased, Respondents.**

Nos. 05–0386, 05–0788.

Supreme Court of Texas.

May 23, 2008.

Rehearing Denied Oct. 10, 2008.

Greg White, Naman, Howell, Smith & Lee LLP, Andy McSwain, Colin H. O'Neill, David Dumas, Fulbright Winniford, P.C., Alfred MacKenzie, Haley & Olson, P.C., Waco, TX, for Petitioners.

Vincent L. Marable, III, Paul Webb, P.C., Wharton, TX, Sharon Loraine Cullen, McKinney & Cooper, LLP, Houston, TX, James R. Dunnam, Dunnam & Dunnam, Waco, TX, for Respondents.

Justice HECHT delivered the opinion of the Court, in which Justice BRISTER, Justice GREEN, Justice JOHNSON, and Justice WILLETT joined.

NATHAN L. HECHT, Justice.

Twenty-one-year-old Lance Dowell was taken to the emergency room and treated for a superficial, self-inflicted cut on his left wrist. Distraught over losing his girlfriend, he had been threatening to kill himself earlier, but he had calmed down and did not want to be hospitalized. He was released on his promises that he would not commit suicide, would stay with his parents, and would go to the local Mental Health and Mental Retardation center for a follow-up assessment. His mother, a registered nurse, was with him and did not object to his release. He went to a family reunion and to a rodeo with his brother, repeatedly assuring his mother that he was okay. His mother and brother believed him, and no one else reported anything unusual in his behavior. But thirty-three hours after his release, he hanged himself. Lance's parents now contend that his tragic death was proximately caused by the negligence of the emergency room physician and nurse in releasing him. We hold that any connection between his release and death is too attenuated for proximate cause. Accordingly, we reverse the judgment of a divided court of appeals[1] and render judgment for petitioners.

Friday evening before Labor Day 1997, Lance took three or four Tylenol sinus capsules with a shot of whiskey and used his pocket knife to cut his wrist. The cut was about three centimeters long and two millimeters deep. A police officer and deputy sheriff called to the scene found him sitting alone in the living room of his

---

1. 167 S.W.3d 48 (Tex.App.–Waco 2005).

parents' house on their farm near Teague, Texas. Lance was not bleeding, but there was blood on the porch and in the living room. While the officers tried to enter through the back door, Lance crawled out a window and hid in the woods nearby. Larry, his older brother, arrived to wait for his return, and the officers left.

About an hour and a half later, Lance returned. He was distraught because the parents of his sixteen-year-old girlfriend had told him to stay away from her. Lance told Larry to leave him alone and let him "finish it". Earlier that week, Lance had alarmed his girlfriend by telling her he had taken "some pills", and she had called his mother, Carolyn, in Waco (about 55 miles west of Teague). Lance told his mother that he had only taken a few Advil, and Carolyn checked his vital signs and found them normal. She insisted he drink plenty of water but sought no treatment for him. But in the early hours of Saturday morning, Larry thought Lance was serious and called the officers back out to the house.

Lance was saying he would kill himself if everybody left, so the deputy sheriff took him into custody, as permitted by Texas law,[2] and drove him to respondent Providence Health Care's emergency room in Waco. Lance was agitated at first but calmed down during the hour-and-fifteen-minute drive, and did not talk a lot. He was no longer saying he wanted to kill himself. They arrived at the ER at 6:47 a.m.

Lance had been there before. When he was 19, another girlfriend threatened to leave him, and he went out in the pasture and put a gun to his head. He surrendered the gun without incident, and a deputy sheriff drove him from Teague to Providence's ER. Though he was detained under an emergency warrant,[3] he consented to being admitted for treatment at respondent DePaul Center, Providence's psychiatric treatment division. He was discharged five days later and instructed to obtain counseling from the local Mental Health and Mental Retardation center, but he never did.

On this second visit, Lance was examined by a DePaul nurse, Mary Theresa Fox, and by the ER physician, respondent James C. Pettit, who sutured his cut. Pettit and Fox talked with Lance very briefly, and neither made a comprehensive assessment of his risk of suicide. Carolyn arrived, and Lance told her he did not want to be kept there. He told Fox he was not suicidal and did not want to be admitted to DePaul. Because he was an adult, he could not be held involuntarily for more than the holiday weekend without a court order.[4] Fox agreed to release him if he

---

**2.** See TEX. HEALTH & SAFETY CODE § 573.001(a) ("A peace officer, without a warrant, may take a person into custody if the officer: (1) has reason to believe and does believe that: (A) the person is mentally ill; and (B) because of that mental illness there is a substantial risk of serious harm to the person or to others unless the person is immediately restrained; and (2) believes that there is not sufficient time to obtain a warrant before taking the person into custody."), (d) ("A peace officer who takes a person into custody under Subsection (a) shall immediately transport the apprehended person to: (1) the nearest appropriate inpatient mental health facility; or

(2) a mental health facility deemed suitable by the local mental health authority, if an appropriate inpatient mental health facility is not available.").

**3.** See id. §§ 573.011–.012.

**4.** See TEX. HEALTH & SAFETY CODE § 573.021(b) (providing in relevant part that "[a] person accepted for a preliminary examination may be detained in custody for not longer than 24 hours after the time the person is presented to the facility unless a written order for further detention is obtained. . . . If the 24-hour period ends on a Saturday, Sunday, legal holiday,

would sign a no-suicide contract (part of the standard treatment in such situations), go to the MHMR center for assessment the following Tuesday, and promise to stay with his family until then. Lance told Fox he would stay with his family and signed the contract, agreeing to talk with a friend, family member, or a staff person at De-Paul if he had feelings or urges to hurt or to kill himself he felt he could not control. Carolyn had concerns about Lance's being released but did not voice them. He was discharged at 9:32 a.m.

Later Saturday morning, Carolyn drove Lance and his sister to a weekend family reunion at Lake Limestone (about 20 miles south of Teague), where, in her words, "there would be a lot of people around who loved [Lance]". Lance's father, Jimmy, was already there. Carolyn told him what had happened and that they "needed to keep a real close eye on Lance". Jimmy was retired under a long-term disability and had been hospitalized in the past for mental health problems.[5] Carolyn knew from reading the ER discharge sheet that Lance had been instructed to stay with his family until he could be seen and assessed by a counselor, and she was concerned about leaving Lance with Jimmy while she returned to Waco to work, but she knew there would be other family members around. Lance kept telling her he would be okay.

Larry was at the reunion, too, and he told Lance they should talk if Lance had a problem. To "keep his spirits up", Larry took Lance to a rodeo Saturday night.

Lance talked with friends, and Larry saw nothing in his behavior to cause concern. After the rodeo, Larry drove to the farm, and Lance went alone in his pickup to see a friend. Larry did not know someone was supposed to stay with Lance at all times, and anyway, as he said, "21–year-old guys do sometimes what they want". Lance got to the farm about 2:00 a.m. and went to bed.

Sunday morning Larry and Lance slept in, then went back to the reunion for lunch. Carolyn called Lance after she got off work, and he told her not to worry, that he would be okay. Larry left Sunday afternoon after Lance agreed to join him at a cousin's party that evening. Lance stayed to help his father, but later he drove to the farm to help a family friend bale hay. When Carolyn called late Sunday afternoon, Jimmy told her where Lance had gone, and she felt okay because he would not be alone. Carolyn and Larry both testified that if they had seen or heard of anything unusual in Lance's behavior during the weekend, they would immediately have sought care for him.

About 7:00 p.m., the friend Lance had gone to help found his body hanging in a tree at the farm. In his pickup, parked nearby, a girl's picture was on the steering wheel and Lance's picture was on the driver's seat.

Almost two years later, Jimmy and Carolyn brought this wrongful death and survival action against Providence, DePaul, and Pettit. The jury found that the defendants' negligence caused Lance's death,

---

or before 4 p.m. on the first succeeding business day, the person may be detained until 4 p.m. on the first succeeding business day"), (c) ("A physician shall examine the person as soon as possible within the 24 hours after the person is apprehended ....") (post–1997 amendments omitted); see Act of April 29, 1991, 72nd Leg., R.S., ch. 76, §§ 1, 20, 1991

Tex. Gen. Laws 515, 577, 648 (adopting the Health and Safety Code in a nonsubstantive recodification of prior statutes).

5. Jimmy's mental problems associated with his disability are what the dissent refers to as "a family history of severe depression", post at 333, and "a family history of hospitalization for depression", post at 334.

allocated responsibility 40% to Providence, 40% to DePaul, and 20% to Pettit, and assessed damages of $400,000 for the Dowells and $400,000 for Lance's estate. The trial court rendered judgment on the verdict. A divided court of appeals affirmed.[6]

The Dowells contend that petitioners were negligent in discharging Lance from the ER without a comprehensive assessment of his risk for suicide. Petitioners argue that even if they were negligent in that respect, their negligence was not, as a matter of law, a proximate cause of Lance's death a day and a half later. We agree with petitioners.

Several things defeat causality. In the first place, although the Dowells' expert testified that many patients will consent to treatment when sternly confronted with the dangers of refusal, there is evidence that Lance himself would not have consented to treatment and no evidence that Providence could have kept Lance from being discharged. Two years earlier, Lance had agreed to five days' treatment at DePaul, but the record does not show that, on the occasion before us, either Lance, his mother, his brother, Petit or Fox believed Lance should have been hospitalized. In fact, Lance's mother testified that Lance asked her not to "let them keep me here" and told her "I don't want to be here." These statements are important because Lance had complete control over whether to stay or go—the Dowells do not argue that there were grounds to hold Lance involuntarily. Evidence that a reasonable patient would have consented to treatment might sometimes be enough,[7]

but in this case, the undisputed evidence of Lance's intentions is sufficient to refute the Dowells' expert testimony of what most patients would do under similar circumstances.

Furthermore, the Dowells' expert never actually testified that hospitalization, more likely than not, would have prevented Lance's suicide.[8] The expert opined that Lance was at high risk for suicide and that his discharge from the ER in that condition caused his death. The expert also testified that he gave "strong consideration" to the similarity of Lance's suicide attempt two years earlier in concluding that if Lance had again been hospitalized as he was then, the result would "most likely" have been the same. But when asked directly about whether hospitalization would have prevented Lance's suicide, the expert answered only that Lance "would have improved" and been at a "lower risk" of suicide when he left. No one supposes hospitalization would have made Lance worse. The issue is whether hospitalization would have made Lance's suicide unlikely, and the Dowells' expert rather pointedly did not offer that opinion.

Also, Lance's discharge from the ER was simply too remote from his death in terms of time and circumstances. After Lance's release, his mother watched him carefully and checked him repeatedly. She took him to a family retreat where he would be surrounded by people who would support him. She called to hear him assure her he was okay. Lance's brother did what he could to lift Lance's spirits and be sure that he would be in a group.

6.   167 S.W.3d 48 (Tex.App.–Waco 2005).

7.   *Cf. McKinley v. Stripling,* 763 S.W.2d 407, 410 (Tex.1989) (discussing the test for informed consent).

8.   *See Park Place Hosp. v. Estate of Milo,* 909 S.W.2d 508, 511 (Tex.1995); *Kramer v. Lewis-ville Mem'l. Hosp.,* 858 S.W.2d 397, 404 (Tex. 1993) (explaining that the Wrongful Death Act "authorizes recovery solely for injuries that cause death, not injuries that cause the loss of a less-than-even chance of avoiding death" and refusing to adopt a common law cause of action for lost chance of survival).

They saw no cause for alarm in Lance's weekend behavior, and no one reported anything unusual to them. If Lance had followed the written discharge instructions to "[s]tay w/parents", then as the Dowells' expert conceded, it is doubtful he would have committed suicide. And if he had been hospitalized, the Dowells' expert could not rule out the possibility that he still would have killed himself.

We faced a similar situation in *IHS Cedars Treatment Center of DeSoto, Texas, Inc. v. Mason.*[9] Two mental health patients, Mason and Thomas, were discharged from the hospital at the same time.[10] Twenty-eight hours later, the two were in a Corvette together when Thomas, who was driving at high speed, "flew into an angry rage", swerved to miss a dog in the road, and lost control of the vehicle.[11] Mason was paralyzed in the accident.[12] She sued the hospital and others, alleging that they should have known she feared Thomas, who was "manipulative and controlling",[13] and therefore Thomas posed a danger to her.[14] Mason's expert testified that she "was likely to place herself in a position to cause serious harm to herself",[15] and Mason argued that it was that propensity that caused her to go along with Thomas in the first place. Although Mason's expert opined directly that the defendants' negligence caused her to be injured, we concluded that the evidence "fail[ed] to provide a sufficient causal nexus between the duties and breaches on the part of [the defendants] and the injuries suffered by Mason".[16]

The Dowells do not make a for-want-of-a-nail argument of the kind squarely rejected in *IHS Cedars*[17] that Lance's discharge set up a chain of events that ultimately led to his suicide. Rather, they contend that discharging him when he was at high risk for suicide directly resulted in his death. They argue that *IHS Cedars* is distinguishable because, as the opinion noted, Mason's mental illness did not cause the car accident, whereas Lance's illness did cause his own death. But Mason's argument was not that her illness caused a dog to run into a roadway or Thomas to speed and lose control; rather, it was that because of her inability to resist Thomas, she went along even though she knew it was dangerous. Similarly, Lance's inability to cope with personal crises led to his death.

In *IHS Cedars*, we said: "the conduct of the defendant may be too attenuated from the resulting injuries to the plaintiff to be a substantial factor in bringing about the harm".[18] In this case, the defendants' negligent conduct was their failure to comprehensively assess his risk for suicide. Because there is no evidence that Lance could have been hospitalized involuntarily, that he would have consented to hospitalization, that a short-term hospitalization would have made his suicide unlikely, that he exhibited any unusual conduct following his discharge, or that any of his family or

9.   143 S.W.3d 794 (Tex.2004).

10.  *Id.* at 797.

11.  *Id.*

12.  *Id.*

13.  *Id.* at 796, 801.

14.  *Id.* at 797.

15.  *Id.* at 803.

16.  *Id.*

17.  *Id.* at 800.

18.  *Id.* at 799 (citing *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex.1995), *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 776 (Tex.1995), and *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 472 (Tex.1991)).

friends believed further treatment was required, the defendants' negligence was too attenuated from the suicide to have been a substantial factor in bringing it about.

The dissent argues that requiring evidence that Lance would have consented to hospitalization is a new and insurmountable legal hurdle, but it is neither. It is certainly not new. We have previously recognized "a duty of cooperation which patients owe treating physicians who assume the duty to care for them."[19] The dissent contends that this duty does not apply when a patient is impaired, but the undisputed evidence is that Lance did not view himself as impaired and did not want to be hospitalized, and there is no evidence that he could have been hospitalized against his will. The dissent argues that "the Court seems to imply that suicide is simply not preventable",[20] but we do no such thing. Suicide is preventable. Lance's suicide was preventable: the evidence is undisputed that if Lance had stayed with his family as instructed, he would not have hanged himself when he did. But there is no evidence that Providence and Pettit caused Lance's suicide to occur when it did. The dissent seems to imply that a health care provider who is negligent in treating a patient's mental health is liable regardless of whether the negligence caused a subsequent suicide, thereby becoming in effect an insurer of the patient's conduct, whatever it might be. There is no basis for omitting the requirement of causation for mental health care providers.

We conclude that Lance's discharge from Providence's ER did not proximately cause his death. Petitioners raise a number of other issues we need not reach.

Accordingly, we grant the petitions for review, and without oral argument,[21] reverse the court of appeals' judgment and render judgment for petitioners.

Justice WAINWRIGHT, concurring in part and dissenting in part.

The Court holds that there was legally insufficient evidence that the conduct of Providence Health Center, DePaul Center, and Dr. Pettit (collectively the defendants) caused Lance Dowell's suicide. I hesitate to join the Court's opinion as there seems to be some unchallenged evidence that the health care providers' breach of duty was a causative agent. I write separately because the trial court erred in failing to include Lance in the negligence and proportionate responsibility questions. I therefore concur in the Court's holding reversing the judgments of the court of appeals, but would remand to the trial court for a new trial.

After their son Lance's unfortunate suicide, Carolyn and Jimmy Dowell (the Dowells) sued the defendants for wrongful death damages and for survival damages on behalf of Lance's estate, alleging that Lance received negligent health-related services and that the defendants departed from accepted standards of medical care. The Dowells asserted that the defendants' failure to properly evaluate and retain Lance in the DePaul facility caused his death. The trial court submitted the negligence of Providence, DePaul, and Dr. Pettit to the jury but did not include Lance or his parents in the submission. The defendants objected to the omission of Lance and his parents from the negligence and proportionate responsibility questions. The jury found that all three defendants

**19.** *Jackson v. Axelrad*, 221 S.W.3d 650, 654 (Tex.2007) (quoting *Elbaor v. Smith*, 845 S.W.2d 240, 245 (Tex.1992)).

**20.** *Post* at 336.

**21.** Tex.R.App. P. 59.1

were negligent and that their negligence proximately caused Lance's suicide. In apportioning responsibility, the jury found Dr. Pettit twenty percent liable, Providence forty percent liable, and DePaul forty percent liable. The jury awarded $400,000 in wrongful death damages and $400,000 in survival damages. The court of appeals affirmed.

The defendants assert that it was erroneous for the trial court to exclude Lance and his parents from the questions in the jury charge. I conclude that although it was not error to exclude the Dowells, it was error for the trial court to refuse to include Lance in the negligence and proportionate responsibility questions.

A reviewing court may reverse and remand for a new trial based on an alleged error in a jury charge only if such error "was reasonably calculated and probably did cause the rendition of an improper judgment." *Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n,* 710 S.W.2d 551, 555 (Tex.1986); *see also Sterling Trust Co. v. Adderley,* 168 S.W.3d 835, 843 (Tex.2005); *Reinhart v. Young,* 906 S.W.2d 471, 473 (Tex.1995). To make this determination, the reviewing court should consider "the pleadings of the parties, the evidence presented at trial, and the charge in its entirety." *Island Recreational Dev. Corp.,* 710 S.W.2d at 555.

The defendants first argue that they submitted evidence of the Dowells' negligence and that such evidence entitled them to a jury question regarding the Dowells' negligence and proportionate responsibility. Specifically, the defendants point to the failure of the Dowells to remain with Lance in the thirty-six hours between his discharge and suicide, despite Nurse Fox's instruction to do so. Generally, however, there is no duty to control the conduct of third persons. *See Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523,

525 (Tex.1990). Although there is an exception to this rule when a special relationship exists, including between a parent and child, *see id.,* a child is understood to be a "a person under 18 years of age who is not and has not been married." *See* TEX. FAM. CODE § 101.003. As an adult, Lance was not under the legal control or supervision of his parents. A lack of action on the part of the Dowells could not constitute contributory negligence in the absence of some legal duty. *See Thapar v. Zezulka,* 994 S.W.2d 635, 637–39 (Tex.1999) (holding a mental-health professional owes no duty to warn third parties of a patient's threats in the absence of a doctor-patient relationship with the third parties). Therefore, the trial court did not err in refusing to submit a question on the Dowells' negligence and proportionate responsibility.

Next, the defendants argue that Lance was negligent in failing to follow his discharge instructions, and that his negligence should have been submitted to the jury. The Dowells respond that the Legislature has specifically prohibited juries from considering the negligence of people who commit suicide. Section 93.001 of the Texas Civil Practice and Remedies Code provides that in a civil action for personal injury or death, "if [a person's] suicide or attempted suicide was caused in whole or in part by a failure on the part of any defendant to comply with an applicable legal standard, then such suicide or attempted suicide shall not be a defense." *See also Kassen v. Hatley,* 887 S.W.2d 4, 12 (Tex.1994). Applying the statute to this case means that Lance's conduct in committing suicide could not be considered by the jury. *See Dallas County MHMR v. Bossley,* 968 S.W.2d 339, 346 (Tex.1998) (Abbott, J., dissenting); *Kassen,* 887 S.W.2d at 12.

The Dowells argue that since the defendants do not contest the finding of their

breach of the standard of care, a jury could not consider any of Lance's conduct. The statute, however, does not say that all acts of a deceased cannot be considered by a jury when determining proportionate responsibility for causing the injuries in a case. Rather, upon finding that the defendants breached an applicable legal standard, the statute precludes the "suicide or attempted suicide" from being an affirmative defense. TEX. CIV. PRAC. & REM.CODE § 93.001.

This raises the question: Under what circumstances and in what light may Lance's actions be considered by the jury? Chapter 33 of the Texas Civil Practice and Remedies Code requires proportioning of damages among responsible parties. Section 33.003 specifies that a jury "shall determine the percentage of responsibility ... with respect to each person's causing or contributing to cause in any way the harm for which recovery of damages is sought, whether by negligent act or omission, by any defective or unreasonably dangerous product, by other conduct or activity that violates an applicable legal standard, or by any combination of these." TEX. CIV. PRAC. & REM.CODE § 33.003. The jury is to make this determination for all claimants, defendants, and responsible third parties, where evidence has been submitted to support such a question. *Id.*; *F.F.P. Operating Partners, L.P. v. Duenez,* 237 S.W.3d 680, 687 (Tex.2007). If Lance's actions apart from the act of committing suicide violated an applicable standard of care (such as negligence), a jury should have weighed such actions in assigning proportionate responsibility.

Before being discharged from the hospital, Lance was instructed by Nurse Fox to take a prescribed medication [1] and remain with family members until a follow-up examination at the MHMR center in three days. A jury could have determined from the evidence submitted that Lance failed to follow those instructions and that such failure was a contributing cause of his death. We have previously recognized that a patient has a duty to cooperate with treating physicians, which includes cooperation both in diagnosis and in treatment. *Jackson v. Axelrad,* 221 S.W.3d 650, 654 (Tex.2007); *Elbaor v. Smith,* 845 S.W.2d 240, 245 (Tex.1992). In *Elbaor,* we held that the failure of a patient to take prescribed antibiotics was evidence of negligence that should have been submitted as a question to the jury. *Elbaor,* 845 S.W.2d at 251. We later reaffirmed allowing a jury to consider the conduct of patients when determining proportionate responsibility as part of an inclusive comparative negligence scheme rather than "compartmentaliz[ing] negligence in rigid categories." *Jackson,* 221 S.W.3d at 654.

JUSTICE O'NEILL's dissent argues that the jury could not have found Lance negligent, based on expert testimony that his mental condition impaired his ability to follow instructions. While the jury, if asked, may not have found Lance negligent, it was the jury's role and not ours to determine whether Lance's conduct contributed to his harm (and to what degree, if any) or whether Lance's mental state absolved him of responsibility for a portion of the harm. It was not given that opportunity. Just as the Dowells were entitled to argue to the jury that Lance was not negligent based on his mental condition and circumstances, the defendants were entitled to attempt to convince the jury of Lance's negligence and his proportionate responsibility for his death. Although this approach charges juries with the subtle

---

1. Contrary to the dissent's suggestion, prescribing medication was part of the physician's treatment of Lance, and there is no evidence that prescribing medication to help Lance get much needed sleep was not part of his psychiatric treatment.

task of separating generally negligent conduct of the deceased from the conduct involved in commission of the suicide, I believe juries, properly selected and guided, are capable of accomplishing this nuanced task. *See F.F.P. Operating Partners, L.P.*, 237 S.W.3d at 693 (citing cases in which juries considered subtle distinctions in apportioning damages between intoxicated patrons and dram shops). Contrary to JUSTICE O'NEILL's assertion, my position is not that "parties that breached the standard of care [should] be absolved from liability," but that, as the Legislature directed, where multiple parties caused or contributed to cause harm, each should be held responsible for their percentage of responsibility. 262 S.W.3d 324, 332.

Failure to include the requested questions was reasonably calculated and probably did cause the rendition of an improper verdict. *Reinhart*, 906 S.W.2d at 473. The trial court should have included Lance in the negligence question, with an instruction to the jury, if requested, not to consider Lance's act of suicide in determining whether Lance's negligence, if any, proximately caused his death. Any subsequent finding of Lance's proportionate responsibility would be limited to Lance's negligence in the first question. As the language of the assumption of the risk statute governs all "civil action[s] for damages for personal injury or death," in this case the same limitations in the charge for use of the suicide as an affirmative defense apply to Carolyn and Jimmy Dowell. *See* TEX. CIV. PRAC. & REM.CODE § 93.001. Accordingly, I would reverse the court of appeals' judgments and remand these cases to the trial court for a new trial.

Justice O'NEILL filed a dissenting opinion, in which Chief Justice JEFFERSON and Justice MEDINA joined.

Lance Dowell was brought to the emergency room by police after he attempted suicide by slitting his wrist severely enough to require stitches, hid from police officers in the woods all night, and told police officers repeatedly that he would try to kill himself again. Despite these circumstances and the presence of a number of high risk factors—including past hospitalization for attempted suicide, another possible suicide attempt earlier that week, and a family history of severe depression—the hospital discharged Lance within three hours with no psychiatric treatment and instructed him to return for a follow-up exam in three days. Lance committed suicide thirty-three hours later. Lance's family presented expert evidence that the suicide-risk assessment performed in the emergency room was so cursory and incomplete as to breach the standard of care and that, had the proper assessment been performed, the standard of care would have required different treatment to be prescribed. The Court does not dispute the providers' negligence and acknowledges that the doctor and nurse failed to comprehensively assess Lance's suicide risk. 262 S.W.3d 324, 336. Nevertheless, the Court concludes there is no evidence of causation and reverses the trial court's judgment. To reach that result, the Court constructs new legal hurdles that are insurmountable, particularly when, as here, the provider's alleged negligence results in death. Because the Court misapplies the law and disregards relevant evidence, I respectfully dissent.

A proper legal-sufficiency review requires courts to credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005). To establish liability based on medical negligence, a plaintiff must demonstrate that a legal duty exists, the duty was breached, and

the breach in reasonable medical probability caused the injury. *See IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason,* 143 S.W.3d 794, 798 (Tex.2004); *Park Place Hosp. v. Estate of Milo,* 909 S.W.2d 508, 511 (Tex.1995). The Court concludes the Dowells failed to prove causation because no evidence was presented that Lance could have been hospitalized if he had been properly diagnosed or that hospitalization would have made his suicide improbable. The Court also concludes that the suicide was too remote from the negligent discharge to constitute legal cause. I disagree.

All of the expert testimony at trial indicated that Lance's medical assessment failed to take into consideration significant suicide risk factors. Lance's examination lasted only two to three minutes, even though the Dowells' expert testified it takes most professionals an hour to do a comprehensive and competent risk assessment for suicide and to evaluate the patient adequately. Moreover, the suicide assessment record that was made was wrong, indicating Lance had never before attempted suicide when clearly he had and the Center had ready access to that information. The Dowells' expert testified that nearly all of the overlooked risk factors, including a family history of hospitalization for depression and suicidal ideation and Lance's suicidal behavior days before, pointed toward a high risk that Lance would commit suicide. That expert concluded: "I think based on the inadequate risk assessment for suicide that was done on Lance, that he should have been admitted to the hospital or a psychiatrist should have been called. I think that … it was erroneous for [the emergency room doctor] to discharge him at that time." When asked whether that error rose to a breach of the standard of care, the expert responded that it did. The expert reiterated that point in later testimony, explaining that because a proper evaluation would have found that "Lance was at high risk of killing himself," the standard of care required that he be provided some form of psychiatric treatment before discharge.

Yet the Court holds that the jury's verdict cannot stand because the Dowells failed to prove that, had Lance been properly diagnosed, he would have voluntarily submitted to hospitalization or could have been involuntarily retained. However, nothing in our jurisprudence requires them to do so. Today, the Court adds a causative element to a patient's burden when a health care provider negligently fails to diagnose or diagnoses improperly, requiring the patient to demonstrate that he would have followed appropriate medical advice had it been given. In cases like this, where the patient dies as a result of the alleged negligent treatment, that burden could never be met, as such testimony would surely be excluded as speculative. *See Int'l & Great N. R. Co. v. White,* 103 Tex. 567, 131 S.W. 811, 812 (1910) (holding that a witness may not testify as to what a deceased person would have done because such testimony is mere speculation); *see also* TEX.R. EVID. 602; TEX.R. EVID. 701.

Though we have never required a health care liability plaintiff to prove he would have followed a doctor's proper diagnosis and recommended treatment had it been made, we do require a plaintiff who alleges lack of informed consent to show that a reasonable person would have refused consent had the risks been explained. *McKinley v. Stripling,* 763 S.W.2d 407, 410 (Tex.1989). The Dowells presented evidence that a reasonable person similarly situated would have consented to hospitalization. The evidence presented indicated that suicidal patients generally consent to hospitalization when it is properly advised. All three of the Dowells' experts testified that, in their experience, all or nearly all of

their patients agree to hospitalization when the consequences of not doing so are explained. In sum, the Dowells presented evidence that a reasonable person in Lance's position would have agreed to hospitalization, and there is no legal support for requiring more.

The Court concludes that Lance's statement that he would rather not stay negates the experts' testimony. However, unlike the patients described in the experts' testimony, Lance was never advised to stay. There is no evidence that, had it been explained to Lance that it was in his best interest to stay, he would have refused. If anything, the nurse in this case appeared to *discourage* Lance's hospitalization, advising his mother that a stay "would just run up a big bill" and admonishing Lance that he should have insurance. And although Lance's mother was present when the nurse instructed him to stay with his parents, she testified that the nurse never gave her any instructions with regard to Lance's care. The written "instructions" Lance received were cursory and stated in their entirety: "Be seen at MHMR on Tuesday. Stay w/ parents until seen & assessed by counselor." This evidence, a reasonable factfinder could have concluded, likely indicated to Lance and his mother that his condition did not warrant serious immediate concern. Because Lance was never properly advised, we cannot know whether he would have consented to treatment, and nothing in our jurisprudence requires such a showing.

The Court further concludes there is no evidence that hospitalization would have made Lance's suicide "unlikely." 262 S.W.3d at 328. Yet the Dowells' expert testified, as the Court acknowledges, that the probable outcome of hospitalization would be that Lance's risk of suicide would be significantly lowered. The expert went on to explain that a significant drop in suicide risk occurs after treatment in ninety to ninety-five percent of patients in Lance's situation and that, with proper treatment, suicidal ideation passes after twenty-four to ninety-six hours. As the Dowells' expert noted, Lance's prior suicide attempt and emergency room visit were under very similar circumstances. Then, Lance was admitted for six days and no further suicidal episodes occurred until this one two years later. The Dowells' expert considered that "if [Lance] were admitted this time, most likely, the same outcome would have occurred." In my view, the Dowells presented some evidence that, in reasonable medical probability, Lance's suicide would have been prevented but for the providers' negligence, which is all that the law requires. *See Park Place Hosp.*, 909 S.W.2d at 511.

Citing our decision in *IHS Cedars Treatment Center of DeSoto, Texas v. Mason*, the Court concludes as a matter of law that Lance's suicide was too attenuated from the providers' negligence for causation to exist. *See* 143 S.W.3d at 794. In *IHS Cedars*, the plaintiff was discharged from a mental-health facility along with a fellow patient who had allegedly befriended her and asserted unnatural influence over her. Twenty-eight hours after their discharge, the plaintiff was riding in the friend's car when the friend experienced a psychotic episode that caused her to speed and drive erratically. When a dog ran out in front of the car, the friend swerved to avoid it and crashed the car, causing plaintiff's injuries. We held the chain of causation was too remote for liability purposes because the defendants could not have foreseen at the time of plaintiff's discharge that she would later be riding with the friend, who would experience a psychotic episode, drive fast, and swerve to avoid an animal that ran out into the road. Unlike *IHS Cedars*, in this case there was a causal connection between Lance's negligent treatment and his later injury. Lance was

taken to the emergency room precisely because he had attempted suicide. The Dowells alleged, the jury found, and the health care providers no longer contest that the providers were negligent in not properly assessing and treating Lance's suicide risk. The experts testified that when he was discharged, "Lance was at high risk of killing himself." That high risk became a reality thirty-three hours later. On this record, I simply cannot agree that Lance's suicide was so attenuated from the providers' negligence as to vitiate causation as a matter of law. In addition, there was no intervening tortious conduct here. The Court implies that Lance's family was contributorily negligent in letting Lance out of their sight. But parents have no legal duty regarding the behavior of their adult children. *Villacana v. Campbell*, 929 S.W.2d 69, 75 (Tex. App.–Corpus Christi 1996, writ denied). In any event, Lance's parents' ability to supervise and assess his behavior more properly speaks to whether the providers breached the standard of care. As the Dowells' expert explained, given that Lance's brother and the police had been unable to keep Lance safe the night before he visited the emergency room, it was a breach of the standard of care to believe his parents would have been able to effectively do so. Furthermore, the fact that Lance showed no signs of his impending suicide that were discernible to his family is precisely why the intervention of trained mental-health professionals is so important. Although Lance's mother was a nurse, she had no training or experience with mental-health patients or in identifying the indicia of severe depression. She relied upon the nurse's assessment, and only a proper medical evaluation could have revealed the severity of Lance's illness. Lance's family was not an adequate substitute for professional care. Thus, releasing Lance into the care of his family could not have been an intervening cause.

Finally, by imposing additional evidentiary burdens on mental-health patients when improper diagnosis leads to death, the Court seems to imply that suicide is simply not preventable. This premise, however, is contrary to the Civil Practice and Remedies Code, Section 93.001(a)(2), which provides: "if the suicide or attempted suicide was caused in whole or in part by a failure on the part of any defendant to comply with an applicable legal standard, then such suicide or attempted suicide shall not be a defense." TEX. CIV. PRAC. & REM.CODE § 93.001(a)(2).

Recognizing that the statute precludes an affirmative defense of suicide when, as here, an applicable legal standard has been breached, JUSTICE WAINWRIGHT would nonetheless require the jury to assess and allocate Lance's proportionate responsibility. According to JUSTICE WAINWRIGHT, Lance's failure "to take a prescribed medication and remain with family members" could be a contributing cause of his death "apart from the act of committing suicide...." 262 S.W.3d at 332. Under such an approach, a factfinder would have to somehow separate Lance's suicide from the events leading to his suicide. However, I find it unlikely that, in drafting the statute, the Legislature intended parties who breached the standard of care to be absolved from liability because the act of isolating one's self in order to commit suicide is somehow separable from the act of suicide itself. Notwithstanding the difficulties inherent in requiring the factfinder to divorce actions leading to suicide from the actual event, there is no factual support for such a submission in this case. Undisputed evidence indicates that the medication Lance was prescribed was to help him sleep, not specifically to treat his psychiatric needs. In addition, the Dowells' expert testified at length about "no-suicide" contracts and similar instructions

to and agreements with patients. He opined that such agreements are generally ineffective at preventing suicide unless they are part of an inpatient treatment plan. The expert stated that it was "foolish" to expect a patient at a high risk of suicide to comply with a "no-suicide" contract or other post-release instructions relating to suicide prevention. He explained that "the debilitating effect of depression on a person's mental processes" inhibits an individual's ability "to use self-control and good judgment," and that an impulsive suicidal patient such as Lance would be at risk for violating any promises about his post-release behavior. This would include following the providers' terse instruction to "[s]tay w/parents." JUSTICE WAINWRIGHT's approach would attribute causation for breach of a mental health standard of care to the patient whose undiagnosed mental impairment was the very cause of injury, which is clearly contrary to the statute's intent. See TEX. CIV. PRAC. & REM.CODE § 93.001(a)(2). The providers' release of Lance with only a few words of generalized instruction breached the standard of care precisely *because* Lance could not be expected to follow it. The cases JUSTICE WAINWRIGHT cites for support do not concern patients with mental illness whose abilities to comply with treatment plans were substantially impaired. *See Jackson v. Axelrad,* 221 S.W.3d 650 (Tex.2007); *Elbaor v. Smith,* 845 S.W.2d 240 (Tex. 1992).

In sum, I do not agree that the evidence in this case is legally insufficient or the injury too attenuated to support the jury's findings, or that the case was improperly submitted, and would affirm the judgments of the trial court and the court of appeals. Because the Court does not, I respectfully dissent.