

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-12-00518-CV

COWBOYS CONCERT HALL-                                    APPELLANT
ARLINGTON, INC.

V.

BRUCE JONES                                                      APPELLEE

----------

### FROM THE 17TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellant Cowboys Concert Hall–Arlington, Inc. (Cowboys) appeals from the trial court's judgment entered in favor of appellee Bruce Jones (Bruce) after a jury verdict. We affirm the trial court's judgment in part but reverse the trial court's gross-negligence and exemplary-damages judgment and render a take-nothing judgment on those issues. We also reverse the trial court's judgment

---

[1]*See* Tex. R. App. P. 47.4.

awarding past-medical expenses and render a judgment in the appropriate amount. *See* Tex. R. App. P. 43.2(a), (c), 43.3.

## I. BACKGROUND

### A. COWBOYS AND ITS BOUNCERS

Cowboys is a large dance hall and nightclub in Arlington that has a dance floor, a mechanical bull, a gaming area, a performance stage, and five bars located on three levels. On a busy night, Cowboys draws approximately 1,500 people. Cowboys employees routinely ask an average of three to four people to leave the club each night, and fights occur on a nightly basis. Further, the Texas Alcohol and Beverage Commission (the TABC) has investigated multiple "problems" at Cowboys, including employees possessing marijuana on the premises and minors drinking alcohol in the parking lot.

All Cowboys employees are trained through the TABC to recognize when customers have consumed too much alcohol. As part of its staff, Cowboys hires "floormen," which are commonly referred to as "bouncers." Although Cowboys' owner Michael Murphy stated that Cowboys tries to conduct background checks on any bouncer it hires, a background check was not a part of the personnel file of any of Cowboys' employees. However, one bouncer had been told that a background check had been completed before he was hired. The bouncers' duties were to keep the facility clean, talk with the customers, maintain the "party atmosphere through control," and "watch for situations where people might be getting a little heated and trying to start something." Bouncers also were

2

required to break up fights in the club and to ask patrons that were "out of control" to leave the club. The bouncers, who wear identifiable uniforms, communicate with each other and local police by radio. Arlington required Cowboys to have two uniformed police officers in the parking lot during business hours.

As part of their training, bouncers were supposed to review Cowboys' policy manual and then would be assigned to accompany a head bouncer for two to three weeks, "and he would show them how to work their sections and what to look for and what to do."[2] The policy manual cautioned employees that physical contact with customers should be avoided. Further, if an employee believed that a customer must be physically removed, that employee was instructed to consult with the manager about the next appropriate step. One of Cowboys' former head bouncers stated that he had never received a copy of the policy manual and that he had not given one to the bouncers he trained.

### B. BRUCE AND HIS FAMILY ARRIVE AT COWBOYS

On April 5, 2008, at approximately 10:15 p.m., Bruce and several of his family members arrived at Cowboys: Kim Jones (Kim), Bruce's wife; Jeremy Jones (Jeremy), Bruce's son; Brenda Long (Brenda), Bruce's sister; Darren Long (Darren), Brenda's husband; and four of Bruce's nieces and nephews. That night, the lead bartender at Cowboys was Melany Jacoby, the head bouncer was

---

[2]A Cowboys bouncer testified that this tag-along training lasted only one to two nights.

Randy Anderson, and the bouncers were Christopher McElroy, Chris Duncan, and Aaron Transome. McElroy previously had voiced "concerns" to the manager, Ryan Gurland, that Anderson "touched the patrons too much"; however, Anderson continued to work at Cowboys as a head bouncer.

When Bruce and his family arrived at Cowboys, they decided not to start a tab at the large bar by the entrance because they got a table near the dance floor, which was closer to a different bar. Each table located in the dance-floor area was near a small, elevated platform, which the drink waitresses occasionally would dance on. The group had been drinking before they left for Cowboys and continued drinking once they arrived. Jacoby noted that the group was happy and laughing when they arrived. Once the group sat at the table, Bruce jokingly pretended to try to get on the platform to dance with the drink waitress. The drink waitress told him to stop, which Bruce did.[3] Bruce spent the majority of the night at the table near the dance floor with Kim, Brenda, and Darren. Jeremy and the other nieces and nephews did not stay at the table and were in other areas of the club.

At approximately 11:15 p.m., Bruce and Jeremy approached the bar Jacoby was stationed at. Jacoby noticed that they were "agitated" but she served them two beers. After they left the bar area, she notified the bouncers to

---

[3]Bruce testified that the drink waitress did not tell him to stop, and Darren stated that he did not hear the drink waitress say anything to Bruce. Brenda, however, heard the drink waitress tell Bruce to stop.

4

keep an eye on them because they seemed upset. Around that same time, Bruce had returned to the table and expressed that he was ready to leave; however, Darren convinced the group to stay until midnight.

## C. JEREMY'S THREE STRIKES

McElroy averred that Jeremy was a problem that evening. At some point, McElroy was called to a table near the dance floor because Jeremy was dancing on the platform with a drink waitress. McElroy went to the platform and told Jeremy to get down, which he did. Later, McElroy received a second call about Jeremy again being on the platform. McElroy again got Jeremy to climb down and told Jeremy if he did it again, the whole group would be asked to leave Cowboys. The group told McElroy, "[I]t's not a problem, we've got him." A short time later, however, McElroy again was called to the platform because Jeremy had climbed back up to dance. When he got this third call, McElroy was "out back" smoking marijuana with the mechanical-bull operator. McElroy went back inside to the table and saw Jeremy "coming down" from the platform. Jeremy told McElroy, "It's going to take more than you to get me out of here." When Jeremy began to walk off, McElroy told Anderson and Duncan that Jeremy "needed to call it a night" and asked them to escort Jeremy out of Cowboys.

## D. DUNCAN CONFRONTS THE GROUP

No other evidence indicated that Jeremy's behavior was the reason the group was asked to leave Cowboys, and Jeremy denied being approached by a bouncer that night. At some point, Bruce had left the foursome's table to watch

5

the mechanical bull, which was on a different level of the club. When Bruce returned to the table, which was about ninety minutes after Bruce's previous attempt to dance with the drink waitress, Duncan approached Bruce and asked him to step off to the side. Duncan stated that he approached Bruce because he had received a report that a man had fallen near the mechanical bull. Duncan said that when he told Bruce that he needed to stop drinking, Bruce and his family became hostile and cursed at him. Duncan then told them that they had to leave the club.

Bruce, Kim, Darren, and Brenda all testified that Duncan approached Bruce, asked Bruce to accompany him alone into a room, and would not explain what the problem was. Bruce refused because he felt like "something was not right." Bruce, Brenda, Kim, and Jeremy felt threatened and decided to voluntarily leave to avoid any trouble. Indeed, Darren believed the bouncers "were wanting something to happen here." Duncan used his radio to call for backup in escorting the group out. Jeremy approached the table at this point, and Brenda told him they all needed to leave.[4]

The group (which included Bruce, Kim, Darren, Brenda, Jeremy, Duncan, Anderson, and McElroy) began to head for the exit. Jeremy and Brenda walked ahead of the others. Bruce and Kim followed approximately ten to thirty feet

[4]Some testimony indicated that Bruce asked Brenda to find Jeremy and bring him to the exit. Either way, it was undisputed that Jeremy joined the group shortly after Bruce told Duncan they would leave.

6

behind Jeremy and Brenda, and Darren was in the rear. McElroy and Jacoby stated that Anderson and Duncan were behind Jeremy. Bruce saw four bouncers, including Duncan, walking with Jeremy and Brenda.

## E.  THE FIGHT[5]

As the group got close to the exit and the large bar near the door, Jeremy mistakenly thought he needed to return to that bar to get his credit card. Duncan testified that when Jeremy turned to go back to the bar, he hit Duncan in his left eye. No one, including McElroy, saw Jeremy hit Duncan, and Jeremy denied hitting Duncan. Indeed, pictures of Duncan taken after the fight did not show any injury to Duncan's eye. Jeremy testified that he raised his arm to point "like I got to turn around and get the debit card." Duncan tackled Jeremy down to the ground. McElroy stated that when he assisted Duncan in stopping Jeremy from "charging," they fell to the ground. Anderson came in to help and restrained Jeremy. At this point, Kim grabbed McElroy and yelled either "why are y'all doing this to us" or "what did you do." Duncan stated that he saw Kim "jumping on top of" Anderson to get "them" off Jeremy, which Kim denied. Another bouncer came to restrain Kim and remove her from Cowboys.

---

[5]Of course, details of the fight vary widely from witness to witness. The events happened quickly and, presumably, adrenaline, alcohol, and marijuana played a large part, which do not lead to exactitude. Indeed, Cowboys describes the fight as a "chaotic situation." Adding to this problem is the fact that the trial did not occur until four years after the event. We have attempted to point out major factual differences but it would be impossible and fruitless to point out each and every variance in an emotionally charged situation.

Anderson handcuffed a struggling Jeremy,[6] and Duncan got up to tell Bruce to stay back. Duncan testified that Bruce then aggressively grabbed Duncan's shirt, Duncan grabbed Bruce's hand, and they tumbled to the ground together with Bruce landing on his back and Duncan landing on top of Bruce. There was no testimony that Bruce ever hit, pushed, or kicked anyone. Jacoby, Bruce, Kim, Brenda, and Darren all testified that when Bruce stepped forward to tell Jeremy not to go back to the bar, Duncan tackled Bruce to the ground. Likewise, Jacoby, who was standing near the incident, did not see Bruce grab Duncan's shirt. From this point forward, Bruce remembers nothing more of the fight. Duncan turned Bruce over to his stomach, held his hands behind his back, and kept his knee in Bruce's back. At this point, Brenda, Jeremy, and Jacoby saw that Bruce did not have any injuries.

Darren and Jeremy saw an unidentified person kicking at Bruce while he was on the ground, but neither saw any actual contact because other patrons had begun to congregate around the area. When Bruce was hauled up, Jeremy saw that Bruce was "extremely bloody, and his eye was swollen." Likewise, Duncan noticed Bruce "was bleeding from multiple places" when he helped get

---

[6]Because the bouncers were not allowed to carry handcuffs, the handcuffs belonged to the on-site police officers.

8

Bruce off the floor.[7]  McElroy later noticed blood on the floor where Bruce had been.

By the time the group finally was forced out of Cowboys, Jeremy was in handcuffs in the back of a patrol car, Kim was in handcuffs, and Bruce was in handcuffs sitting on the back of a golf cart.[8]  It was disputed whether Bruce was handcuffed inside Cowboys or after he was in the parking lot.  Bruce suffered a broken nose, some eye damage, and a head gash.  Pictures taken of Bruce after he was taken to the hospital showed that he had been badly battered.  It was discovered at the hospital that Bruce's blood-alcohol content was above the legal limit.  A subsequent TABC investigation into the incident found that an "aggravated breach of the peace" had occurred and that the TABC believed the breach "could have been prevented by proper actions" by Cowboys.

### F.  THE LAWSUIT

Bruce filed suit against Cowboys based on allegations of negligence; gross negligence; negligent hiring, supervision, and training; assault; and false imprisonment.[9]  During trial, Cowboys' corporate representative could not appear, which caused the parties to enter into an agreement and stipulation

---

[7]Jacoby stated that McElroy helped Bruce up, while McElroy testified that he was with Jeremy the entire time.

[8]No charges were filed against any of the three.

[9]Bruce also raised claims under the Dram Shop Act and for intentional infliction of emotional distress but dismissed those claims before they were submitted to the jury.

regarding the jury charge on gross negligence. In short, Cowboys agreed not to object to the wording of the gross-negligence jury question if Duncan and Anderson were specifically named as the parties through whom gross negligence could be imputed to Cowboys. Cowboys stated that it was "not agreeing . . . that there's proof for [the gross-negligence] submission" but that the agreement went solely to the wording of the gross-negligence question.

The jury found that Duncan and Anderson were acting in the scope of their employment during the incident and that the negligence of Cowboys, Bruce, and Jeremy proximately caused the incident. These parties' percentages of responsibility were Cowboys at 70%, Bruce at 5%, and Jeremy at 25%. The jury found that Duncan, while in the course and scope of his employment, assaulted and falsely imprisoned Bruce. The jury found that Anderson did not assault or falsely imprison Bruce but found that Anderson was grossly negligent and imputed liability for Anderson's gross negligence to Cowboys. The jury did not find that gross negligence could be imputed to Cowboys through Duncan's actions. The jury calculated Bruce's damages as follows:

- Physical pain and mental anguish sustained in the past: $125,000
- Loss of earning capacity sustained in the past: $12,000
- Disfigurement sustained in the past: $5,000
- Physical impairment sustained in the past: $10,000
- Medical-care expenses incurred in the past: $14,500
- Exemplary damages based on gross negligence: $225,000

10

Cowboys filed a motion for judgment notwithstanding the verdict. *See* Tex. R. Civ. P. 301. The trial court granted the motion in part, lowered the jury's exemplary-damages award to the applicable $200,000 statutory limit, and entered final judgment on the jury's remaining findings. *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.008(b) (West Supp. 2013). Cowboys then filed a motion for new trial. *See* Tex. R. Civ. P. 320. The trial court granted the motion in part and modified the amount of past medical expenses to $11,916.96. Cowboys filed a second motion for new trial and a motion to modify the judgment, which were overruled by operation of law. *See* Tex. R. Civ. P. 329b(c), (g).

Cowboys timely filed a notice of appeal from the trial court's judgment and now raises twelve issues arguing that it is entitled to a take-nothing judgment, a modified judgment, or a new trial. In two issues, Cowboys argues the jury charge contained reversible error because it contained no indication of the basis upon which the jury predicated its finding of gross negligence and because it failed to include a definition of physical impairment. In four issues, Cowboys argues there was legally or factually insufficient evidence to support the jury's findings that: (1) Bruce was entitled to exemplary damages based on Anderson's actions, (2) Cowboys was negligent, (3) Duncan falsely imprisoned Bruce, (4) Duncan assaulted Bruce, and (5) Duncan was acting in the course and scope of his employment. Cowboys asserts in four issues that the jury's individual damages awards were supported by insufficient evidence. In their final two issues, Cowboys contends that the trial court erred by admitting evidence of the TABC's

11

investigation into the fight and that Bruce's closing jury arguments were improper and prejudicial.

## II. SUFFICIENCY OF THE EVIDENCE

As indicated above, Cowboys challenges the sufficiency of the evidence on all bases upon which Cowboys' liability to Bruce was predicated and upon which Bruce bore the burden of proof at trial.[10]

### A. STANDARDS AND SCOPE OF REVIEW

### 1. Preponderance of the Evidence

The majority of Bruce's claims were required to be proven by a preponderance of the evidence. As such, we may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable fact-finder could and disregard evidence contrary to the finding

---

[10]Cowboys additionally challenges the sufficiency of the evidence to support the jury's implicit negative finding on an issue upon which it had the burden of proof—legal authority to justify false imprisonment. We will state the applicable standard of review when discussing that issue.

12

unless a reasonable fact-finder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g). "Factual sufficiency points of error concede conflicting evidence on an issue, yet maintain that the evidence against the jury's finding is so great as to make the finding erroneous." *See Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co.*, 766 S.W.2d 264, 275 (Tex. App.—Amarillo 1988, writ denied).

## 2.  Clear and Convincing Evidence

In challenging the jury's gross-negligence finding, Cowboys implicates an issue that Bruce had the burden to prove by clear and convincing evidence. *See U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 137–38 (Tex. 2012).  Clear and convincing evidence is that measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.  Tex. Civ. Prac. & Rem. Code Ann. § 41.001(2) (West 2008); *Waldrip*, 380 S.W.3d at 137.  This intermediate standard of proof falls between the preponderance standard of proof of most civil proceedings and the

13

reasonable doubt standard of proof of most criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979). While the proof must be of a heavier weight than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed. *Addington*, 588 S.W.2d at 570.

In evaluating the evidence for legal sufficiency, we must determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction that its finding was true. *State v. K.E.W.*, 315 S.W.3d 16, 20 (Tex. 2010); *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 248 (Tex. 2008). We review all the evidence in the light most favorable to the finding. *Waldrip*, 380 S.W.3d at 138; *Hogue*, 271 S.W.3d at 248. We resolve any disputed facts in favor of the finding if a reasonable fact-finder could have done so. *K.E.W.*, 315 S.W.3d at 20; *Hogue*, 271 S.W.3d at 248. We disregard evidence contrary to the finding unless a reasonable fact-finder could not. *K.E.W.*, 315 S.W.3d at 20; *Hogue*, 271 S.W.3d at 248. That is, we consider undisputed evidence even if it is contrary to the finding. *Hogue*, 271 S.W.3d at 248; *Wilson*, 168 S.W.3d at 817. The fact-finder, not this court, is the sole judge of the credibility and demeanor of the witnesses. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

In evaluating the evidence for factual sufficiency, we determine whether, on the entire record, a fact-finder could reasonably form a firm conviction or belief that its finding was true. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). If, in

14

light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *Id.* But we must not supplant the jury verdict with our own. *Id.*; *see also Barker v. Eckman*, 213 S.W.3d 306, 314 (Tex. 2006). The fact-finder is the sole judge of the credibility of witnesses and the weight to be given their testimony. *H.R.M.*, 209 S.W.3d at 109; *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

## B. NEGLIGENCE

### 1. Breach

Cowboys asserts that there is insufficient evidence to support a finding of negligence against Cowboys.[11] To prove negligence by Cowboys, Bruce had to produce evidence showing (1) a legal duty owed by Cowboys to Bruce, (2) a breach of that duty, and (3) damages proximately caused by the breach. *IHS*

---

[11]As we discuss below, Cowboys does not appropriately attack the sufficiency of the evidence to support the jury's negligence finding as to Cowboys regarding Bruce's allegations that Cowboys negligently hired, trained, or supervised its employees. In its attack on the jury's gross-negligence finding, Cowboys does assert that there was "no evidence that Cowboys negligently hired an unfit agent in Mr. Anderson." But this argument is cursory at best and fails to account for the admitted evidence that Cowboys did not conduct background checks of its employees and that Anderson had a criminal record. In any event, these unchallenged theories of negligence liability are enough to support the jury's negligence finding as to Cowboys. In an abundance of caution, however, we will address the sufficiency of the evidence to support the theories of negligence liability argued by Cowboys in its brief, which focus solely on the bouncers' actions during the fight.

15

*Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004). Cowboys first contends the evidence failed to sufficiently show that Cowboys breached any duty to Bruce or that Bruce's injuries were proximately caused by any action by Cowboys or its employees.

Regarding evidence of breach, Cowboys states that the "precipitating event" was Jeremy's "decision to either go back to a bar to retrieve a credit card he already had or to strike . . . Duncan. . . . Up until that point, there is no evidence to show that Cowboys or any of its employees had breached any duties to [Bruce]." In its reply, Cowboys merely states that Bruce "has still not shown that Cowboys breached any duty owed to him." This is the entirety of Cowboys' appellate argument on breach regarding the jury's negligence finding. As Bruce points out, any actions by Jeremy do not directly relate to the determination of whether Cowboys breached a duty *to Bruce*, who was located approximately ten to thirty feet away from Jeremy. Further, the jury was free to disbelieve Duncan's testimony that Jeremy hit him based on the picture of Duncan showing he had no injury after the fight and on the testimony of other eyewitnesses, including McElroy, who stated Jeremy did not hit Duncan. In the absence of careful briefing on this issue, we are not willing to discuss in the first instance the applicable law regarding a breach of duty to a business invitee by that business's employees or how the evidence did or did not show such a breach in this case. *See, e.g.*, *Fulgham v. Fischer*, 349 S.W.3d 153, 158 (Tex. App.—Dallas 2011, no pet.); *Ratsavong v. Menevilay*, 176 S.W.3d 661, 665–66 (Tex. App.—El Paso

16

2005, pet. denied), *cert. denied*, 549 U.S. 886 (2006). It is enough to say that the evidence, while conflicting, was legally and factually sufficient to show Cowboys breached a duty to Bruce. *See, e.g.*, *Kroger Co. v. Betancourt*, 996 S.W.2d 353, 359–60 (Tex. App.—Houston [14th Dist.] 1999, pet. denied).

## 2. Proximate Cause

Cowboys next asserts proximate causation was not shown through legally or factually sufficient evidence because "no one testified that they saw how [Bruce] was injured"; thus, "the causal link is . . . too attenuated to support the jury's finding of negligence." Indeed, proximate causation is an essential ingredient of a finding of negligence. Proximate cause requires cause-in-fact and foreseeability.[12] *IHS Cedars*, 143 S.W.3d at 798. If a defendant's actions merely furnish a condition that make the injury possible, there can be no cause-in-fact. *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 551 (Tex. 2005). However, there may be more than one cause-in-fact for a single injury. *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992); *Morrell v. Finke*, 184 S.W.3d 257, 284 (Tex. App.—Fort Worth 2005, pet. denied). As with the other elements of a negligence claim, proximate causation must be supported by evidence that goes beyond mere conjecture, guess, or speculation. *IHS Cedars*, 143 S.W.3d at 798–99. But a plaintiff is not required to exclude the possibility that the event that caused damage was brought about by some factor other than the defendant's conduct,

---

[12]Cowboys does not clearly raise a challenge to the sufficiency of the evidence to show foreseeability.

as long as the plaintiff shows that it is more probable than not that the defendant's conduct was a cause of the injury. 1 J. Hadley Edgar Jr. et al., *Texas Torts & Remedies* § 1.04[2][a] (2013).

Cause-in-fact includes a but-for element and a substantial-factor element: Cause-in-fact is present if the act or omission was a substantial factor in bringing about the injury, without which the harm would not have occurred. *Rodriguez-Escobar v. Goss*, 392 S.W.3d 109, 113 (Tex. 2013); *see also Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2524–25 (2013). Cowboys' appellate argument, by concentrating on the attenuation between its conduct and Bruce's injury, necessarily challenges the sufficiency of the evidence to meet the substantial-factor test. The substantial-factor test concerns how close in the causal chain the defendant's actions are to the plaintiff's injury. *Rodriguez-Escobar*, 392 S.W.3d at 113. Thus, an actor's negligence "may be too attenuated from the resulting injuries to the plaintiff to be a substantial factor in bringing about the harm." *Providence Health Ctr. v. Dowell*, 262 S.W.3d 324, 328 (Tex. 2008). A defendant's conduct is considered a substantial factor in causing the event if the conduct had such an effect in producing the harm as to lead reasonable people to regard it as a cause. *Lear Siegler, Inc. v. Perez*, 819 S.W.3d 470, 472 (Tex. 1991).

We cannot agree with Cowboys that the lack of direct testimony that a Cowboys employee was actually seen hitting or kicking and making contact with Bruce equates to insufficient evidence that Cowboys' actions or inactions were a

18

substantial factor in causing Bruce's injury. *See J.K. & Susie L. Wadley Research Inst. & Blood Bank v. Beeson*, 835 S.W.2d 689, 698 (Tex. App.—Dallas 1992, writ denied) (recognizing proximate cause is issue for fact-finder that may be inferred from accident's surrounding circumstances in absence of direct proof). It is undisputed that Duncan and Bruce fell to the ground after Bruce attempted to get to Jeremy. Bruce had no injuries before Duncan landed on top of Bruce. Bruce was flipped to his stomach and restrained on the ground with his hands behind his back. Once Bruce was lifted up from the floor, he was severely injured. Although Duncan testified that no one ever hit or kicked Bruce, Jeremy and Darren stated that they saw someone kick Bruce. Darren averred that it was a bouncer that was kicking at Bruce.

This evidence, which was more than mere evidence that an accident occurred and was not impermissibly speculative, allowed a reasonable fact-finder to determine that while Bruce was restrained by an employee of Cowboys and defenseless, another person kicked Bruce. The causal chain linking Cowboys to Bruce's injury is not so attenuated that its actions or inactions could not be considered a legal cause. *See J. Wigglesworth Co. v. Peeples*, 985 S.W.2d 659, 663–64 (Tex. App.—Fort Worth 1999, pet. denied). Cowboys' conduct, through the actions of its employees, did more than merely furnish the condition that made Bruce's injury possible. *See Lear Siegler*, 819 S.W.2d at 472; *J. Wigglesworth*, 985 S.W.2d at 663–64. The evidence was legally and factually sufficient to allow the jury to infer that Cowboys' actions did more than furnish a

19

condition allowing Bruce's injuries to occur and were not too remote in the causal chain, which is all that the substantial-factor test requires. *See McClure v. Allied Stores of Tex., Inc.*, 608 S.W.2d 901, 903–05 (Tex. 1980) (holding store security guard's negligence in pursuing shoplifter reasonably could be regarded as substantial factor in bringing about injury to shopper pushed to ground by shoplifter because fact-finder could reasonably infer that shoplifter began to run as result of unsuccessful arrest attempt).

### C. INTENTIONAL TORTS: FALSE IMPRISONMENT AND ASSAULT

Cowboys argues that the evidence was legally and factually insufficient to support the jury's finding that Duncan falsely imprisoned or assaulted Bruce. Cowboys also asserts that it cannot be held vicariously liable for Duncan's actions because the evidence was insufficient to show Duncan was acting in the course and scope of his employment or authority.

### 1. Course and Scope of Employment

To impose liability on Cowboys for Duncan's intentional torts under the doctrine of respondeat superior, Bruce was required to show that Duncan's actions fell within the scope of his general authority in furtherance of Cowboys' business and for the accomplishment of the object for which Duncan was hired. *See Commonwealth of Mass. v. Davis*, 168 S.W.2d 216, 225 (Tex. 1942), *cert. denied*, 320 U.S. 210 (1943); *Wrenn v. G.A.T.X. Logistics, Inc.*, 73 S.W.3d 489, 493 (Tex. App.—Fort Worth 2002, no pet.) (op. on reh'g). "An employee's tortious conduct is within the scope of employment when that conduct is of the

20

same general nature as that authorized or incidental to the conduct authorized." *Wrenn*, 73 S.W.3d at 494. Conduct that is of the same general nature as that authorized or that is incidental to the authorized conduct falls within the scope of employment even if the act is contrary to express orders. *Id.* But if Duncan deviated from the performance of his duties for his own purposes, then Cowboys is not responsible for what occurred during the deviation. *ITT Consumer Fin. Corp. v. Tovar*, 932 S.W.2d 147, 158 (Tex. App.—El Paso 1996, writ denied). Whether Duncan was acting within the scope of his employment and whether he deviated from his duties are questions to be determined by the fact-finder. *See Durand v. Moore*, 879 S.W.2d 196, 199 (Tex. App.—Houston [14th Dist.] 1994, no writ).

Ordinarily, intentional torts such as false imprisonment or assault are not within an employee's course and scope of employment. *Wrenn*, 73 S.W.3d at 494. But intentional torts committed in the accomplishment of a duty entrusted to the employee, and not because of personal animosity, may render the employer liable. *Id.* Cowboys asserts that "[t]here is no evidence on the record to show that getting into a fight with patrons somehow advances or assists Cowboys' business. . . . Cowboys' written policy was to refrain from even touching patrons, let alone striking them." The policy, while stressing the importance of courtesy and maintaining a "party atmosphere," expressly dictated that crowd "control" was an essential job duty:

21

As a floorman at Cowboys, your purpose is to maintain excellent customer service and the party atmosphere through control. In order to maintain this control, the floormen must be able to develop a positive relationship with the customers and his fellow employees, in particular, the waitresses. You must have command of presence and the respect of everyone you come in contact with. . . .

        . . . .

        . . . All situations must be handled as consistently, quickly, and professionally as possible without disturbing the flow or party atmosphere of Cowboys. . . . No floorman will provoke a fight under any circumstances! . . . The important thing is that the party atmosphere is not disturbed. . . . If you feel physical removal is going to be necessary; consult with a manager, calling the police for assistance might be in order, bu[t] this is a decision for management. . . . Remember, your job is customer service through control.

In addition to the policy, bouncers were instructed that they could restrain patrons if necessary. Fights were a nightly occurrence at Cowboys, which the bouncers were required to handle. Further, Anderson, the lead bouncer, was present at the time of the fight and assisted in restraining Jeremy. McElroy testified that he and Duncan talked with Anderson before deciding that the group, specifically Jeremy, needed to be removed from Cowboys. The evidence sufficiently showed that Duncan's actions were within the course and scope of his employment as a bouncer. *See G.T. Mgmt., Inc. v. Gonzalez*, 106 S.W.3d 880, 884–85 (Tex. App.—Dallas 2003, no pet.); *Durand*, 879 S.W.2d at 199–201.

## 2. False Imprisonment

The elements of false imprisonment are (1) a willful detention, (2) without consent, and (3) without justification or authority of law. *Dangerfield v. Ormsby*, 264 S.W.3d 904, 909 (Tex. App.—Fort Worth 2008, no pet.).

Cowboys first asserts that the testimony shows Duncan was with Jeremy and not Bruce; thus, there is insufficient evidence that Duncan willfully detained Bruce. But the record shows that Duncan testified he left Jeremy, after Anderson had Jeremy under control, and went to where Bruce was. He specifically stated that he fell to the floor with Bruce and restrained Bruce by himself. There is no merit to this argument.

Second, Cowboys argues that any detention was legally authorized based on Texas law that allows citizens' arrests for offenses against the public peace, including public intoxication. *See* Tex. Code Crim. Proc. Ann. art. 14.01(a) (West 2005); Tex. Penal Code Ann. § 49.02(a) (West 2011). Cowboys asserts that because Bruce's blood-alcohol content was above the legal limit and because he was seen "getting out of hand," Duncan's detention of Bruce was under authority of law.

In the absence of an arrest warrant, "a detention or imprisonment is presumed to be without justification or adequate legal authority unless the contrary appears. The burden is on the defendant to go forward with evidence that the arrest or detention was legally justified." 4 J. Hadley Edgar Jr. et al., *Texas Torts & Remedies* § 51.02[2][a] (2013) (footnotes omitted); *cf. Wal-Mart Stores, Inc. v. Odem*, 929 S.W.2d 513, 519 (Tex. App.—San Antonio 1996, writ denied) (op. on reh'g) (recognizing burden on defendant to show justification for unlawful arrest under statutory shopkeeper's privilege). Because Cowboys bore the burden of proof at trial on this element and now challenges the legal

23

sufficiency of the evidence, we must review all the evidence to determine if the contrary proposition—the presence of legal authority to restrain Bruce—was established as a matter of law. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). The standard of review for Cowboys' factual-sufficiency challenge is the same even though it had the burden of proof: we weigh all the record evidence and determine whether it is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *See Blonstein v. Blonstein*, 831 S.W.2d 468, 473 (Tex. App.—Houston [14th Dist.]) (recognizing same factual-sufficiency standard applies "regardless of whether the court of appeals is reviewing a negative or affirmative jury finding and regardless of which party had the burden of proof"), *writ denied*, 848 S.W.2d 82 (Tex. 1992).

The evidence showed that Bruce only tried to get on the dance platform once and immediately stopped when the drink waitress told him to. Duncan and Jacoby testified that Bruce never hit or kicked anyone. Multiple witnesses testified that Bruce voluntarily said he and the group would leave when told to do so by Duncan. Duncan testified that Bruce had fallen near the mechanical bull and that Bruce and his family became verbally hostile when Duncan said the family needed to leave, but that they voluntarily began to move toward the exit.

As shown by the evidence recited above, the evidence did not establish as a matter of law that Duncan was legally authorized to restrain Bruce. *Cf. Brice v. Hanna*, No. 03-09-00454-CV, 2010 WL 5019468, at *5 (Tex. App.—Austin Dec.

24

10, 2010, no pet.) (mem. op. on reh'g) (concluding fact issues regarding legal authority to arrest plaintiff for public intoxication precluded summary judgment). Public intoxication requires evidence that Bruce was so intoxicated he could endanger himself or another, which is more than Cowboys' assertion that "a reasonable person could have anticipated [Bruce] would become disorderly." *See* Tex. Penal Code Ann. § 49.02(a). Although there was evidence that Bruce fell down, had tried to get on a dance platform, and had a blood-alcohol content above the legal limit, the evidence also showed that Bruce volunteered to leave when confronted by Duncan because he "did not want any trouble" and that Bruce never hit or kicked anyone. Jacoby testified that Bruce did not cause any trouble that night. Likewise, the evidence reveals that the jury's implicit finding that Duncan's restraint was without legal authority is not so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside. *Cf. Davis v. State*, 576 S.W.2d 378, 380 n.2 (Tex. Crim. App. 1978) (finding insufficient facts to justify warrantless arrest for public intoxication).

### 3. Assault

Cowboys contends that the evidence did not support a finding that Duncan assaulted Bruce:

> [N]o one testified that Mr. Duncan struck [Bruce] and caused him injuries. . . . Even if it is inferred that Mr. Duncan did strike [Bruce], that inference is equally as plausible as any number of scenarios, including those of accidental injury by another patron. The fact that [Bruce] received injuries when the melee broke out, involving not just Cowboys' staff but other patrons, is not sufficient evidence to support the jury's verdict.

25

In its reply brief, Cowboys asserts that Bruce's argument that Duncan's restraint was the operative assaultive conduct "does not link the injuries sustained by [Bruce] to Chris Duncan's actions during the fracas that had broken out, and therefore does not establish the essential element of proximate cause." This is the entirety of Cowboys' appellate argument. We will be just as brief.

An assault occurs if a person:

(1) intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse;

(2) intentionally or knowingly threatens another with imminent bodily injury, including the person's spouse; or

(3) intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative.

Tex. Penal Code Ann. § 22.01(a) (West Supp. 2013); *see Loaisiga v. Cerda*, 379 S.W.3d 248, 256 (Tex. 2012) (recognizing civil-assault elements mirror criminal-assault elements). The evidence shows that after Bruce either tried to stop Jeremy from returning to the bar or grabbed Duncan's shirt, Duncan fell on top of Bruce, flipped him onto his stomach, held Bruce's arms behind his back, and held Bruce to the ground. This was legally and factually sufficient evidence to support the jury's finding that Duncan caused physical contact with Bruce of such a nature that Duncan should reasonably have known that Bruce would consider it offensive or provocative. *See Soon Phat, L.P. v. Alvarado*, 396 S.W.3d 78, 107–08 (Tex. App.—Houston [14th Dist.] 2013, pet. denied); *Scott v. Christian*

26

*Methodist Episcopal Church*, No. 02-10-00434-CV, 2012 WL 42991, at *2–3 (Tex. App.—Fort Worth Jan. 5, 2012, no pet.) (mem. op.); *cf. Umana v. Kroger Tex., L.P.*, 239 S.W.3d 434, 436 (Tex. App.—Dallas 2007, no pet.) (holding summary-judgment evidence raised genuine issue of material fact regarding whether actions constituted assault).  Although Cowboys attempts to argue that Bruce did not argue to the jury that the assault was Duncan's take down and restraint of Bruce (instead of the assault being someone kicking him), the jury was instructed that assault could be found upon evidence of "offensive or provocative" physical contact.  Thus, the jury was free to find an assault based on the evidence of offensive or provocative physical contact by Duncan.

### D. GROSS NEGLIGENCE

Cowboys asserts that liability for Anderson's gross negligence, as found by the jury, cannot be imputed to Cowboys because there was no predicate finding that Anderson was negligent.  As stated above, the jury found that Bruce had shown by clear and convincing evidence that his injuries were a result of Anderson's gross negligence and, consequently, liability for Anderson's gross negligence was imputed to Cowboys.  *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a) (West Supp. 2013).  However, the jury found that Bruce's injuries were proximately caused by the negligence of Cowboys, Bruce, and Jeremy.  There was no negligence finding as to Anderson.  Further, the jury specifically found that Anderson did not commit assault or false imprisonment.  A finding of negligence is a necessary prerequisite to a finding of gross negligence.  *Hall v.*

27

*Stephenson*, 919 S.W.2d 454, 467 (Tex. App.—Fort Worth 1996, writ denied). Here, because there was no negligence finding as to Anderson or any finding that Anderson was liable for any claim for actual damages that would support an award of exemplary damages, there can be no finding that Cowboys was grossly negligent based on the actions of Anderson. *See* Supreme Court of Tex. Admin. Order, *Amendments to Texas Rules of Civil Procedure 281 and 284 and to the Jury Instructions under Texas Rule of Civil Procedure* 226A, Misc. Docket No. 11-9047 (Mar. 15, 2011) ("If exemplary damages are sought against a defendant, the jury must unanimously find, with respect to that defendant, (i) liability on at least one claim for actual damages that will support an award of exemplary damages, (ii) any additional conduct, such as malice or gross negligence, required for an award of exemplary damages, and (iii) the amount of exemplary damages to be awarded.") (text also included as historical note to Tex. R. Civ. P. 226a).

Cowboys argues that the negligence question, as posed in the charge, provided "no indication of the basis on which the jury predicated its finding of gross negligence by . . . Anderson." We agree that the negligence finding as to Cowboys cannot be construed to be an implied finding that Anderson was negligent because Bruce alleged other bases to support a negligence finding other than negligence based on the bouncers' actions, i.e., negligent hiring, supervision, and training. These are negligence allegations independent from any action of Anderson.

28

Bruce did not request a jury submission that would have allowed the jury to find that Anderson was negligent; all of Bruce's proposed negligence questions pertained solely to Cowboys' alleged negligence. *See* Tex. R. Civ. P. 273, 274. Bruce also did not object to the lack of a question regarding whether Anderson was negligent. *See* Tex. R. Civ. P. 272, 274. Because Bruce alleged that Cowboys was negligent based on its hiring, supervision, and training of the bouncers, we cannot assume that the jury's negligence finding was based on Anderson's negligent actions found by the jury. *See* Tex. R. Civ. P. 277; Vincent Lee "Tripp" Marable III, *Crafting a Charge From the Plaintiff's Perspective*, 29 The Advoc. (Tex.) 29, 31–32 (2004); *cf. Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990) (op. on reh'g) (holding trial court is not required to ask jury to specify ground on which it relied to answer question in jury charge); *Wackenhut Corr. Corp. v. de la Rosa*, 305 S.W.3d 594, 622 (Tex. App.—Corpus Christi 2009, no pet.) (holding defendant's failure to object to form of jury questions limited appellate review to whether any of plaintiff's theories were supported by sufficient evidence); *Fort Worth Hotel Ltd. P'ship v. Enserch Corp.* 977 S.W.2d 746, 753 (Tex. App.—Fort Worth 1998, no pet.) (holding because jury was instructed that corporate defendant was negligent and that negligence was proximate cause of damages, jury was not required to make new causation finding in order to find or not find gross negligence by defendant). Cowboys does not challenge on appeal the sufficiency of the evidence to support a negligence finding as to Cowboys based on negligent hiring, training, or supervision.

29

Indeed, the testimony at trial showed that no Cowboys employee had a background check included as part of his or her personnel file; the training for bouncers was brief, haphazard, and superficial; and Anderson had a criminal record.

Therefore, Cowboys' negligence, as found by the jury, could have been based on Cowboys' actions that were separate and apart from Anderson's actions. We cannot determine which of Bruce's multiple, alleged negligence theories was the theory under which Cowboys was found negligent; thus, we cannot assume that the negligence finding as to Cowboys was based on Anderson's actions committed during the course and scope of his employment. Bruce's pleadings alleged gross negligence solely arising out of the actions of the bouncers. Therefore, Bruce is not entitled to exemplary damages based on Anderson's gross negligence when Anderson was not specifically found to be negligent. In short, the negligence finding as to Cowboys cannot support the gross negligence finding as to Anderson.

Even if the negligence finding as to Cowboys could be considered a finding of negligence upon which a gross-negligence finding as to Anderson could be based, we would conclude that the evidence was legally and factually insufficient to support the jury's finding that Anderson was grossly negligent.

Gross negligence includes an act or omission

> (A) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of

30

risk, considering the probability and magnitude of the potential harm to others; and

(B)  of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

Tex. Civ. Prac. & Rem. Code Ann. § 41.001(11) (West 2008).  "Under the objective component, 'extreme risk' is not a remote possibility or even a high probability of minor harm, but rather the likelihood of the plaintiff's serious injury." *Waldrip*, 380 S.W.3d at 137.  "The subjective prong . . . requires that the defendant knew about the risk, but that the defendant's acts or omissions demonstrated indifference to the consequences of its acts."  *Id.*

The key difference between negligence and gross negligence is the element of intent, i.e., it is the mental state that justifies the penal nature of the imposition of exemplary damages.  *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 922 (Tex. 1981); *see, e.g.*, *Int'l Armament Corp. v. King*, 686 S.W.2d 595, 597– 99 (Tex. 1985).  This mental component may be shown indirectly through conduct.  *See Wal-Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 326 (Tex. 1993); *Burk Royalty*, 616 S.W.2d at 922.  In our legal-sufficiency review, we must consider all the evidence, particularly all actions or circumstances indicating a state of mind amounting to conscious indifference, in the light most favorable to the finding.  *King*, 686 S.W.2d at 597; *Burk Royalty*, 616 S.W.2d at 922.

To counter Cowboys' argument that the evidence was insufficient to support the jury's gross-negligence finding, Bruce relies on the following evidence:

- Anderson had his hand on Jeremy while Jeremy was walking toward the exit;

- Anderson had a prior criminal history;

- Anderson was involved in restraining and handcuffing Jeremy;

- Darren saw a bouncer with "long, stringy hair" standing by Bruce and kicking; and

- Jeremy saw someone kick Bruce.

Other evidence was admitted that also tended to show Anderson's state of mind amounting to conscious indifference. Duncan testified that Anderson trained him when he was first hired as a bouncer. Anderson discussed his criminal history with McElroy. McElroy thought Anderson "touched the patrons too much" and complained to Gurland, but Anderson continued to work at Cowboys as the head bouncer. McElroy testified that he conferred with Anderson and Duncan when Jeremy continued to dance on the platform and that he told Anderson and Duncan that Jeremy needed to leave Cowboys.[13] Anderson and Duncan escorted Jeremy out. When Jeremy turned to go back to the bar, McElroy stated that Jeremy "charged" before Duncan and McElroy stopped him.

---

[13]As pointed out by Cowboys, there was no jury issue submitted on negligent supervision by Anderson.

32

It is not disputed that Anderson was not involved in knocking Bruce to the floor or restraining him. The only evidence that Anderson was involved in the injuries to Bruce is Darren's testimony that he saw "[t]he [bouncer] with the long, stringy hair . . . make a motion, like kicking motion" while Bruce was on the floor. Bruce avers that because only three bouncers were involved in the fight (Anderson, Duncan, and McElroy) and because neither Duncan nor McElroy have long and stringy hair, Darren necessarily was referring to Anderson. The only evidence in the record regarding the bouncers' hair is testimony that Duncan had red hair and pictures showing that his hair was short. Anderson did not testify at trial. No evidence shows that Anderson had long and stringy hair at the time of the fight or that McElroy's hair was not long and stringy at the time of the fight.[14] Further, another bouncer was on duty the night of the fight: Transome. Although there is no direct testimony that Transome was in the area of the fight, multiple witnesses stated that Bruce was on the floor in a "pile" and that a "jumble" of people were gathered around, which included more than Jeremy, Bruce, Duncan, Anderson, and McElroy.

Even viewing the evidence in the light most favorable to the jury's gross-negligence finding, the evidence is legally insufficient to support a finding that Anderson's actions, when viewed objectively, involved an extreme degree of risk. *See, e.g.*, *Matbon, Inc. v. Gries*, 288 S.W.3d 471, 488–89 (Tex. App.—Eastland

---

[14]McElroy testified at trial, but there is no record evidence about his hair.

33

2009, no pet.). Further, there is no direct or indirect evidence that Anderson subjectively knew about an extreme risk but demonstrated that he did not care. *See, e.g.*, *Waldrip*, 380 S.W.3d at 139–41; *Graham v. Adesa Tex., Inc.*, 145 S.W.3d 769, 774–75 (Tex. App.—Dallas 2004, pet. denied). Thus, a reasonable fact-finder could not have formed a firm belief or conviction that the gross-negligence finding was true. *See Diamond Shamrock Refining Co. v. Hall*, 168 S.W.3d 164, 170–73 (Tex. 2005); *cf. Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 628–29 (Tex. 2004) (holding evidence legally insufficient to support jury finding of actual malice). We must reverse and render a take-nothing judgment on Bruce's claims for gross negligence and the attendant exemplary-damage award. *See Safeshred, Inc. v. Martinez*, 365 S.W.3d 655, 665–66 (Tex. 2012).[15]

### E. DAMAGES

Cowboys argues that there was no evidence, i.e., legally insufficient evidence, to support the jury's compensatory-damage award for lost earning capacity. Similarly, Cowboys argues that the jury's medical-expenses award was excessive or, in other words, that the amount was supported by factually insufficient evidence. Cowboys argues the following damages awards were

---

[15]Because of our conclusion that the gross-negligence finding must be reversed, we need not address Cowboys' arguments that gross negligence cannot be imputed to Cowboys for the actions of Anderson because Anderson was not a manager and because Cowboys did not authorize Anderson's negligent actions.

supported by legally and factually insufficient evidence:  physical pain and mental anguish and past physical impairment.

### 1.  Loss of Earning Capacity Sustained in the Past

The jury found that Bruce had sustained $12,000 in "[l]oss of earning capacity sustained in the past."  Loss of past earning capacity is a plaintiff's diminished ability to work during the period between the injury and the date of trial.  *Bituminous Cas. Corp. v. Cleveland*, 223 S.W.3d 485, 491 (Tex. App.— Amarillo 2006, no pet.); *see Koko Motel, Inc. v. Mayo*, 91 S.W.3d 41, 51 (Tex. App.—Amarillo 2002, pet. denied) (explaining difference between lost wages and lost earning capacity).  To support such an award, the plaintiff must introduce evidence sufficient to allow the fact-finder to reasonably measure earning capacity before injury in monetary terms.  *Bituminous Cas.*, 223 S.W.3d at 491. A plaintiff may include evidence of past earnings, time missed from work, and any other factors that illustrate the plaintiff's reduced ability to perform work in the past.  *See Big Bird Tree Servs. v. Gallegos*, 365 S.W.3d 173, 178 (Tex. App.— Dallas 2012, pet. denied); *Koko Motel*, 91 S.W.3d at 51–52.  Because such proof is largely uncertain, any award is left to the discretion of the jury but must be shown with reasonable certainty.  *McIver v. Gloria*, 169 S.W.2d 710, 712 (Tex. 1943); *Rigdon Marine Corp. v. Roberts*, 270 S.W.3d 220, 232–33 (Tex. App.— Texarkana 2008, pet. denied).

Nevertheless, evidence of the loss of earning capacity must be "in the form of a net loss after reduction for income tax payments or unpaid tax liability

35

pursuant to any federal income tax law," and the trial court "*shall* instruct the jury as to whether any recovery for compensatory damages . . . is subject to federal or state income taxes." Tex. Civ. Prac. & Rem. Code Ann. § 18.091 (West 2008) (emphasis added). The purpose of this statute appears to be the prevention of a plaintiff obtaining a windfall by being awarded pretax income on awards that are not subject to taxation. *Big Bird*, 365 S.W.3d at 179; Claudia Wilson Frost & J. Brett Busby, *Charging the Jury in the Wake of HB 4*, 67 Tex. B.J. 276, 279 (Apr. 2004) ("For example, because a plaintiff's wages would have been taxed once if earned but are not taxed when received as damages, Section 18.091(a) requires that evidence of wages after taxes be presented."). Thus, the trial court under section 18.091(a) is required to instruct the jury that any recovery for certain compensatory damages, such as lost earning capacity in the past, is not subject to taxation. *See* Jennifer Bruch Hogan & Richard P. Hogan Jr., *Charging the Jury in Changing Times*, 46 S. Tex. L. Rev. 973, 1002 (2005).

It is important to clarify that Cowboys is not arguing that the trial court erred by failing to include, sua sponte, a tax-consequences instruction in the jury charge. Cowboys only asserts that the evidence is legally insufficient to support the jury's $12,000 award for loss of past earning capacity. *See* Tex. R. Civ. P. 272; *cf. Interconex, Inc. v. Ugarov*, 224 S.W.3d 523, 532–33 (Tex. App.— Houston [1st Dist.] 2007, no pet.) (op. on reh'g) (holding appellant waived complaint that appellee's testimony as to gross earnings insufficient to support award for past and future lost earnings under section 18.091 because appellant

36

did not object to charge's instruction to not consider taxes in determining damages). In any event, Cowboys waived any complaint that it was harmed by the absence of an instruction under section 18.091 by failing to object to its absence. *See* Tex. R. Civ. P. 272, 274; *Ugarov*, 224 S.W.3d at 532–33. But because Cowboys attacks the legal sufficiency of the evidence to support the award, we look to whether the award was within the jury's discretion to reasonably measure Bruce's earning capacity before he was injured.

Bruce stated he owned a "dirt contracting business" that does "agriculture work mainly, build terraces, tanks, ponds." His business is "a one-man show," and he frequently works "seven days a week to try to stay caught up" for "14 to 15 hours a day." He testified that at the time of the accident, he was making approximately $1,000 a day and that he missed approximately twelve working days because of the damage to his eye and his other physical injuries. Bruce was unable to take a few new jobs while he was injured. During the year that the accident occurred, Bruce earned a gross amount of approximately $400,000 but he stated that he did not "net near what people think." Bruce testified that he made "around [$]280,000" in 2011. There was no instruction regarding the tax consequences of any award, and none was requested.

Here, the jury was presented with evidence that allowed them to measure Bruce's past earning capacity. The jury heard that although Bruce grossed $400,000, his net was substantially less than that amount. Bruce was a sole proprietor and frequently worked seven days a week for up to fifteen hours per

37

day. He typically made approximately $1,000 a day before he was injured. The injuries he sustained caused him to miss approximately twelve days of work and he had to turn down jobs that he previously would have been able to accept. The jury had legally and factually sufficient evidence to determine that Bruce lost approximately $12,000 of earning capacity for his missed work. *See Big Bird*, 365 S.W.3d at 179.

## 2. Medical Expenses

Cowboys next attacks the evidence to support the jury's medical-expenses award. Before the charge was read to the jury, the parties stipulated to the "authenticity and admissibility" of three of Bruce's medical bills[16] "for purposes of proving medical damages." The jury awarded Bruce $14,500 in past medical-care expenses. Cowboys filed a motion for new trial and urged the trial court to modify this award to be the amount reflected in the admitted bills: "roughly $11,800.00, not the $14,500.00 awarded." The trial court granted this portion of Cowboys' motion and modified the medical-expenses award to $11,916.96. Cowboys filed a second new-trial motion and argued that the medical-expense amount was incorrect because "[w]hen the admitted affidavits of medical costs are examined and amounts written off by the providers are taken into account, the amount paid and incurred . . . totals to less than the $11,916.96 currently awarded." Cowboys now argues that the admitted evidence supports only an

---

[16]One of Bruce's medical bills had already been admitted; thus, the stipulation did not include that exhibit.

award of $2,525.50: "[T]here is insufficient evidence of the reasonableness and necessity of the medical expenses incurred for at least $9,391.46 of the amount awarded."

Cowboys focuses its argument on the fact that the only evidence that any medical expenses were reasonable and necessary was for expenses totaling only $2,525.50, which were the amounts shown on two medical bills that were accompanied by a business-records affidavit specifying that "[t]he service provided was necessary and the amount charged for the service was reasonable." By filing a motion for new trial and asserting that the evidence was insufficient to support the medical-damages award based on "the admitted affidavits," Cowboys has preserved error on this issue. *See* Tex. R. Civ. P. 324(b)(4).

As Cowboys points out, an award of past medical expenses must be supported by evidence that the expenses were reasonable and necessary. *See Texarkana Mem'l Hosp., Inc. v. Murdock*, 946 S.W.2d 836, 840 (Tex. 1997). Such an award is "readily capable of measurement by a certain standard"; therefore, a jury's discretion is not as broad as it is with other measures of damages such as pain and suffering. *Id.* at 841. Mere evidence showing that medical expenses were incurred, the nature of the injury, the character of the treatment received, and the amount charged for treatment is not sufficient to prove the expenses were reasonable or necessary. *See Jackson v. Gutierrez*, 77 S.W.3d 898, 902 (Tex. App.—Houston [14th Dist.] 2002, no pet.); *Delta Air*

39

*Lines, Inc. v. Gibson*, 550 S.W.2d 310, 314 (Tex. Civ. App.—El Paso 1977, writ ref'd n.r.e.). The reasonableness and necessity of medical expenses may be established either by (1) expert testimony on those topics or (2) a sufficient affidavit. Tex. Civ. Prac. & Rem. Code Ann. § 18.001 (West Supp. 2013); *Whitaker v. Rose*, 218 S.W.3d 216, 223 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

Bruce did not offer expert testimony of his medical expenses, but he introduced into evidence several past medical bills:

● Bills from the hospital totaling $16,062.90 and accompanied by an affidavit of the hospital's custodian of records stating that the "records are kept in the regular course of business . . . [and] made at or near the time of the act, event, condition, opinion, or diagnosis, or reasonably soon thereafter."

● A bill from the ambulance service totaling $1,142.50 and accompanied by an affidavit of the service's custodian of records stating that "[t]he service provided was necessary and the amount charged for the service was reasonable at the time and place that the service was provided."

● Two bills from one of Bruce's treating physicians totaling $884.61 accompanied by an affidavit of the physician's custodian of records stating that the records are kept "in the regular course of business."

● A bill from a radiologist totaling $1,383.00 accompanied by an affidavit of the "person in charge" of billing records stating "[t]he service provided was necessary and the amount charged for the service was reasonable at the time and place that the service was provided."

Cowboys does not dispute that the bills accompanied by affidavits attesting that the attached expenses were reasonable and necessary are sufficient to support $2,525.50 of the awarded amount. We agree that the remaining bills are not

40

sufficient evidence that the remaining portion of Bruce's past medical expenses were reasonable and necessary.

### 3. Physical Pain and Mental Anguish

Cowboys contends that the evidence does not sufficiently support the jury's $125,000 award to Bruce for past physical pain and mental anguish. Cowboys agrees that matters of pain and suffering are necessarily speculative and are within the jury's province; however, Cowboys asserts that the amount awarded "is grossly disproportionate to any injury or suffering [Bruce] suffered." Indeed, a jury's discretion in determining the amount of such an award is not unlimited; thus, the award must be based on evidence that the awarded amount would provide fair and reasonable compensation for the pain and anguish.

For a mental-anguish award, this includes evidence of the nature, duration, and severity of the mental anguish, which substantially disrupted his daily routine or caused a high degree of mental pain and distress. *Hancock v. Variyam*, 400 S.W.3d 59, 68 (Tex. 2013); *Serv. Corp. Int'l v Guerra*, 348 S.W.3d 221, 231 (Tex. 2011). When a plaintiff fails to introduce such evidence, we must determine whether there is "any evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger to support any award of damages." *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995). Damages for physical pain and suffering may be established by circumstantial evidence and may be inferred from the nature of the injury or the medical treatment received. *See HCRA of Tex., Inc. v. Johnston*, 178 S.W.3d

41

861, 871 (Tex. App.—Fort Worth 2005, no pet.); *Country Roads, Inc. v. Witt*, 737 S.W.2d 362, 365 (Tex. App.—Houston [14th Dist.] 1987, no writ); *Lyons v. Ayala*, 723 S.W.2d 254, 257 (Tex. App.—Fort Worth 1986, no writ).

Here, the jury saw pictures of Bruce's broken nose, the staples that were put in his head to seal the wound that caused his concussion, and the damage to his left eye. Bruce, Kim, and Brenda testified to the pain and depression Bruce experienced after the attack. Bruce stated that he was "bothered" for a long time after the fight, was depressed, and would have nightmares that "these guys are going to come back and get me again."

Cowboys did not object to the joint submission of the mental-anguish damages with the physical-pain damages. Although Bruce's mental-anguish evidence was not as particularized as is required to support the sufficiency of a mental-anguish award,[17] the evidence of Bruce's past physical pain and suffering was more than sufficient to support such an award. *See Flynn v. Racicot*, No. 09-11-00607-CV, 2013 WL 476756, at *6–7 (Tex. App.—Beaumont Feb. 7, 2013, no pet.) (mem. op.). We cannot segregate the propriety of the award between the two measures of damages when Cowboys did not object to the joint submission. *See* Tex. R. Civ. P. 272; *City of Waco v. Fuentes*, No. 10-09-00126-

---

[17] *See Klentzman v. Brady*, No. 01-11-00765-CV, 2013 WL 5655845, at *19–20 (Tex. App.—Houston [1st Dist.] Oct. 17, 2013, no pet.) (discussing specific evidentiary requirements to support mental-anguish damages award).

CV, 2011 WL 817418, at *7 (Tex. App.—Waco Mar. 9, 2011, pet. denied) (mem. op.).

## 4. Past Physical Impairment

Cowboys argues that the jury's $10,000 award for Bruce's past physical impairment is not supported by the evidence: "[T]he question is whether there is evidence to show [Bruce] suffered a restriction of his lifestyle that would not otherwise be compensated by the monetary awards for loss of earning capacity, physical pain, and mental anguish." However, the jury charge informed the jury that, in determining damages, it could not award a double recovery:

> Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss.

We presume the jury followed this instruction. *Golden Eagle*, 116 S.W.3d at 771. Even so, we must consider whether the losses Bruce experienced are distinct from losses compensable under other damages categories. *See Thomas v. Martinez*, 217 S.W.3d 680, 684 (Tex. App.—Dallas 2007, pet. struck); *Patlyek v. Brittain*, 149 S.W.3d 781, 787 (Tex. App.—Austin 2004, pet. denied) (op. on reh'g).

It is difficult to specifically classify losses into different damage categories without substituting our judgment for that of the jury in evaluating in which category, if any, a plaintiff should be compensated. *Patlyek*, 149 S.W.3d at 787. Therefore, we focus on "actual impediments to the plaintiffs' activities." *Id.* We

43

recognize that the majority of Bruce's evidence of physical impairment appears indistinguishable from past pain and suffering and lost earning capacity. However, there was evidence that Bruce's left eye caused him pain for at least two years after the attack. In fact, Bruce occasionally had to use his finger to open that eye, and the eye would not open at all "at night at times." This loss of use of his left eye was separate and apart from the pain and suffering and lost earning capacity he experienced in the immediate weeks after the fight. Further, this difficulty with his left eye continued for two years after the fight, unlike his pain and suffering and lost earning capacity. As we did in *Patlyek*, we hold this evidence sufficient to support the jury's physical-impairment award. *Id.* at 787–88.

### III.  JURY CHARGE

Cowboys asserts the trial court erred by failing to include a definition of physical impairment in the jury charge. As part of the question on the amount of damages, the jury charge asked the jury to enter an amount for Bruce's "[p]hysical impairment sustained in the past." In order to prevent a double recovery, Cowboys requested that the trial court include a definition of physical impairment to clarify that it is "something beyond physical pain, mental anguish, loss of incapacity, et cetera, and relates instead to the loss of the capacity to enjoy life." *See Golden Eagle*, 116 S.W.3d at 772–73. The trial court denied the request.

44

We review a trial court's decision to refuse a particular jury instruction under an abuse-of-discretion standard. *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012). When a trial court refuses to submit a requested instruction on an issue raised by the pleadings and evidence, we must determine whether the instruction was reasonably necessary to enable the jury to render a proper verdict. *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006). If so, the refusal to submit a requested instruction will constitute reversible error only if the omission probably caused the rendition of an improper judgment. Tex. R. App. P. 44.1; *see also Thota*, 366 S.W.3d at 687.

As quoted above, the jury charge instructed that a double recovery was not permitted. This instruction informed the jury of the very thing that Cowboys was trying to prevent. Thus, the requested instruction was not reasonably necessary for the jury to render a proper verdict.

## IV. ADMISSION OF ADMINISTRATIVE EVIDENCE

Cowboys argues that the trial court reversibly erred when it admitted into evidence the TABC's civil-penalty order and testimony by the TABC agent who investigated the incident, William Feick. At trial, Bruce offered into evidence the TABC's conclusion that an "aggravated breach of the peace" had occurred, the TABC's belief that the breach "could have been prevented by proper actions" by Cowboys, and the TABC's investigation of the incident and order for Cowboys to pay a civil penalty. Cowboys objected to the admission of the administrative materials relied on by the TABC in reaching its decision because they were

45

unduly prejudicial and because testimony by the sponsoring witness, Feick, constituted impermissible testimony by an undisclosed expert. The trial court agreed that the bulk of the administrative materials were inadmissible. Bruce then offered only the TABC's civil-penalty order, without the supporting documentation, which Cowboys objected to solely on the basis that the exhibit was not relevant. The trial court overruled the objection and admitted the TABC's civil-penalty order. Before Feick testified that the civil-penalty order was based on a finding that a preventable "aggravated breach of the peace had occurred on a licensed premises," Cowboys objected that the testimony was inadmissible opinion evidence.

Even assuming that admission of the civil-penalty order and Feick's testimony was erroneous, Cowboys has failed to show the requisite harm arising from the error. We will not reverse a trial court's judgment because of an erroneous evidentiary ruling unless the ruling probably, though not necessarily, caused the rendition of an improper judgment. *Waldrip*, 380 S.W.3d at 136; *Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 871 (Tex. 2008); *see also* Tex. R. App. P. 44.1(a). We examine the entire record in making this determination of harm, considering the evidence, strengths and weaknesses of the case, and the verdict. *Waldrip*, 380 S.W.3d at 136; *Guerra*, 348 S.W.3d at 236. We consider whether the admission of the evidence was calculated or inadvertent, whether counsel emphasized the erroneous evidence, and whether

46

contrary evidence existed that the improperly admitted evidence was calculated to overcome. *Waldrip*, 380 S.W.3d at 136; *Guerra*, 348 S.W.3d at 236.

Cowboys' only attempt to show harm is its statement that prejudice is shown "by the various verdicts reached by the jury that were against Cowboys yet not supported by competent evidence." Cowboys has failed to meet its burden on appeal to show harm arising from the admission of the disputed evidence. *See In re M.S.*, 115 S.W.3d 534, 538 (Tex. 2003) (citing *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753–54 (Tex. 1995)).

But we have reviewed the entirety of the record and conclude that admission of the evidence did not cause the rendition of an improper judgment. Feick's testimony regarding the breach of the peace was contained on 2 pages of the approximately 700 pages of testimony. Bruce did not stress this evidence and referred to it only once in his closing argument to the jury. Further, this evidence was not crucial to prove any element of Bruce's case. Indeed, we have held the evidence sufficient on many of Bruce's claims and measures of damages without reference to the administrative evidence. The requisite harm from the admission of the evidence is not shown. *See, e.g.*, *Mason v. Wells Fargo Bank, N.A.*, No. 05-12-01590-CV, 2013 WL 5948077, at *4 (Tex. App.—Dallas Nov. 5, 2013, no pet. h.) (mem. op.); *Citigroup Global Mkts. Realty Corp. v. Stewart Title Guar. Co.*, 417 S.W.3d 592, 602 (Tex. App.—Houston [14th Dist.] 2013, no pet.); *Gutierrez v. Martinez*, No. 01-07-00363-CV, 2008 WL 5392023, at *10 (Tex. App.—Houston [1st Dist.] Dec. 19, 2008, no pet.) (mem. op.).

47

## V. JURY ARGUMENTS

In their final issue, Cowboys argues that several portions of Bruce's closing jury arguments were improper and prejudicial, "[w]hether taken individually or collectively." Cowboys specifies twelve statements made by Bruce during his closing argument. Cowboys objected to none of these statements at trial but did raise the argument in its motions for new trial; thus, it has preserved error only to the extent the argument constituted incurable error. *See* Tex. R. Civ. P. 324(b)(5); *Warrantech Corp. v. Computer Adapters Servs., Inc.*, 134 S.W.3d 516, 531 n.10 (Tex. App.—Fort Worth 2004, no pet.).

Incurable jury argument occurs when comments are so inflammatory that their harmful nature cannot be cured by an instruction to disregard. *Columbia Med. Ctr. of Las Colinas v. Bush*, 122 S.W.3d 835, 862 (Tex. App.—Fort Worth 2003, pet. denied). The complaining party must show, based on the record as a whole, that the offensive argument was so extreme that a juror of ordinary intelligence could have been persuaded by that argument to agree to a verdict contrary to that to which he would have agreed but for such argument.[18] *Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009). It is rare for this showing to be made. *Id.*

---

[18]Jury argument that "strikes at the appearance of and the actual impartiality, equality, and fairness of justice rendered by courts" is not subject to this harm analysis. *Living Ctrs. of Tex., Inc. v. Peñalver*, 256 S.W.3d 678, 681 (Tex. 2008). Cowboys does not assert that any of the complained-of arguments rise to this level and, indeed, none do.

We have reviewed the complained-of arguments in light of the entire record. Although some of the arguments were erroneous, Cowboys has failed to show that the arguments, viewed collectively or individually, struck at the integrity of the verdict. *See, e.g.*, *id.* at 882–83; *Rhey v. Redic*, 408 S.W.3d 440, 465–66 (Tex. App.—El Paso 2013, no pet.); *Gordon v. Leasman*, 365 S.W.3d 109, 117–18 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

## VI. CONCLUSION

We overrule the majority of Cowboys' issues.[19] However, we have concluded that the gross-negligence finding as to Anderson and attendant exemplary-damage award must be reversed.[20] Therefore, we reverse the trial court's judgment to the extent it provided that Anderson committed gross negligence, imputed liability to Cowboys, and awarded exemplary damages. We render a take-nothing judgment on Bruce's claims for gross negligence and exemplary damages. *See* Tex. R. App. P. 43.2(c), 43.3. We also concluded that the jury's award for past medical expenses was excessive.[21] Thus, we reverse that portion of the trial court's judgment awarding $11,916.96 for past medical expenses and render a judgment for $2,525.50 as damages for Bruce's past medical expenses. *See* Tex. R. App. P. 43.2(c), 43.3. We affirm the remainder

---

[19]Specifically, we overrule issues three, four, five, six, eight, nine, ten, eleven, and twelve.

[20]Thus, we sustain issues one and two.

[21]Accordingly, we sustain issue seven.

of the trial court's judgment.  *See* Tex. R. App. P. 43.2(a).  We further conclude that there is good cause to apportion costs of this appeal equally against Cowboys and Bruce; thus, each party to this appeal shall pay one-half of the appellate costs.  *See* Tex. R. App. P. 43.4; *Bus. Staffing, Inc. v. Viesca*, 394 S.W.3d 733, 753 (Tex. App.—San Antonio 2012, no pet.); *Wrenn*, 73 S.W.3d at 501.

PER CURIAM

PANEL:  GABRIEL, MCCOY, and MEIER, JJ.

DELIVERED:  May 1, 2014